# Illinois Official Reports

## Appellate Court

*In re Christian W.*, 2017 IL App (1st) 162897

| | |
|---|---|
| Appellate Court Caption | *In re* CHRISTIAN W., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Christian W., Respondent-Appellant). |
| District & No. | First District, Fourth Division<br>Docket No. 1-16-2897 |
| Filed | August 31, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-JD-3178; the Hon. Patricia Mendoza, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Bluhm Legal Clinic, of Chicago (Maria Hawilo and Thomas Geraghty, of counsel, and Tonie Oglesby, Cristina Messerschmidt, and Sara Lewis, Law Students), for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Joseph Alexander, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Justices McBride and Howse concurred in the judgment and opinion. |

¶ 1    Michael and Travadis Bryant were ambushed and shot in the head while sitting on a porch on the afternoon of July 29, 2015. Fourteen-year-old respondent, Christian W., was charged with two counts of attempted murder and related offenses in connection with the shooting. The charges alleged that Christian shot Travadis and was accountable for a second assailant, who shot Michael. After an adjudicatory hearing in juvenile court before the bench, Christian was found guilty of the charges relating to Travadis and not guilty of the charges relating to Michael.

¶ 2    We reverse the adjudications because the State did not prove Christian guilty beyond a reasonable doubt.

I

¶ 3

¶ 4    Michael testified that he was sitting on a neighborhood porch with his brother Travadis at the time of the shooting. He had turned his back momentarily to put out his cigarette when he heard Travadis say, "Boy what the f***." Michael turned back toward Travadis and saw Christian standing four or five feet away, pointing a black revolver at Travadis's head. After two seconds or so, Christian fired one gunshot at Travadis, at point-blank range, and stood there for a few more seconds with his gun raised. Michael tried to disarm Christian, but a second assailant came out of the gangway, fired three or four gunshots at Michael, and tried to pull Christian away from the scene. Michael was shot in the back of the head and fell on top of Travadis. When he came to, he went looking for help, and a friend drove him to the hospital.

¶ 5    Michael testified that he immediately recognized Christian, a "random little guy" from the neighborhood who had "started hanging around [Michael's] crowd." Michael and Travadis, who were roughly twice Christian's age, were "taken" with the young boy and became friendly with him. Michael knew Christian for four or five years and saw him around the neighborhood several times a week. Michael knew Christian's first name but not his last name.

¶ 6    At the hearing, Michael described Christian as having "raccoon-ish" eyes, with bags or darkened skin underneath, and "fair hair" that was "kind of curly straight almost like Hispanic" so that he did not look "fully African-American." At the time of the shootings, he said Christian wore a black shirt that he held up over his face, brown or tan pants, and black gym shoes. Michael had seen Christian wearing these same clothes for the previous three or four days.

¶ 7    The second shooter had "short nappy hair" that looked like a "miniature fro" and a complexion a bit lighter than Michael's; he wore dark jeans and a black hoodie. Michael was not certain about the identity of the second shooter, but he thought it was another young boy from the neighborhood known as "Munchie," whose real name was Davon McGee and who would later testify as one of Christian's alibi witness.

¶ 8    Detective Rios interviewed Michael in the hospital a couple hours after the shooting. Michael had a graze wound to the back of his head and was getting stitches. Michael initially testified that he "didn't tell [Detective Rios] anything" because he was just "trying to get sowed [*sic*] up" and "wasn't trying to talk to anybody at the time." Michael said he "didn't like [Detective Rios's] vibe"; the detective's "aggressive" "approach" made him feel "like [he] was

the shooter and not the victim." But Michael then testified, in sum, that he gave Detective Rios the same descriptions of two shooters that he gave in later police interviews and again at trial.

¶ 9 The defense called Detective Rios to the stand. He testified that, although Michael was not completely cooperative and was, understandably, more interested in his brother's condition than in talking to the police, Michael did provide the following information. While he was sitting on the porch with Travadis, someone came out of the gangway and started shooting. After Travadis got shot, Michael stepped in front of him and got shot in the back of the head. Michael did not say, in so many words, that the same person shot both of them, but when defense counsel asked, "how many suspects did [Michael] tell you were involved in the shooting," Detective Rios answered, "One."

¶ 10 Rios testified that Michael described the suspect's features and clothing in detail to him. The suspect was a black male, 18 to 20 years old, 5 feet, 4 inches to 5 feet, 5 inches tall, and 140 to 145 pounds; he had a medium complexion and short hair; he wore a green, red, and brown hoodie; and he held up a black scarf that partially covered his mouth. Michael did not say that he knew the shooter, and he did not mention Christian by name. When defense counsel asked why he did not, Michael said, "I don't know. It just didn't seem right at the time to me."

¶ 11 The day after the shootings, Christian turned himself in on an unrelated warrant and was held in custody at the juvenile temporary detention center (JTDC), where Detective Galliardo arrested him for these offenses about two months later. The parties stipulated that (1) the inventory of Christian's belongings when he arrived at the JTDC included a black T-shirt; tan jeans; and red, black, and white shoes and (2) Christian wore a black T-shirt, tan pants, and black and white gym shoes when he was arrested.

¶ 12 Five days after the shooting—August 3, 2015—Detective Galliardo (and a second, unnamed detective) interviewed Michael. Neither detective testified, but Michael testified that he gave them the same description of Christian he claimed to have given on every other occasion: fair, Hispanic-looking hair and "raccoon-ish" eyes; a black shirt; brown or tan pants; and black gym shoes. For the first time, Michael gave the police Christian's name, and he explained how he knew Christian from the neighborhood. Michael also said there was a second shooter, another young boy from the neighborhood known as "Munchie," whose real name, he believed, was Davon McGee.

¶ 13 Six days later, Detective Galliardo showed Michael two photo arrays. Michael identified Christian from one array and said he was certain it was Christian who shot Travadis. Michael tentatively picked out "Munchie" from the second array, but he did not make a positive identification because "[he] wasn't sure, so [he] didn't want to tell them something [he] wasn't for sure about." The second shooter's physique and "small little nappy fro" looked like "Munchie," but he "was kind of like 50/50" because the second shooter wore a hood and mask.

¶ 14 Almost a year later—June 29, 2016—prosecutors met with Michael to prepare for Christian's trial. When they told Michael that "Munchie" had an alibi—the same alibi as Christian, an irony that was not further explored at trial—Michael responded that the second shooter was not Davon McGee but *Donovan* McGee, who was *also* known as "Munchie." Donovan was a black male with dreadlocks, but Michael could not describe him in any further detail. In a supplemental answer that was read into the trial record, the State disclosed Michael's statement that Davon and Donovan were different people. Michael testified at trial, however, that he was referring to one person all along; he was just confused about that person's real name because he knew him only as "Munchie." Michael also testified that Davon used to

have dreadlocks, and this somehow confused Michael into believing that Davon and Donovan were two different people.

¶ 15 In trying to explain why his description of the second shooter changed over time, Michael also testified that he incorporated information he received from the police into his own uncertain recollections. Michael told Detective Galliardo that "Munchie" had a "short nappy fro." Detective Galliardo responded that the "other people [Galliardo] had interviewed" all said "the [second] shooter had dreads." Michael told Detective Galliardo, "that ain't what I seen and that all I know is—I remember the guy Munchie." After his interview with Detective Galliardo, Michael nonetheless "went with *** the dreads." As Michael explained, "I was never one hundred percent sure about the guy had dreads," but "I did tell the State I thought the guy had dreadlocks because that's what [Detective Galliardo] *** was telling me," and "I kind of got confused by the officer coming to tell me what other people were saying."

¶ 16 Davon McGee and La'Keyvion Goings testified to Christian's alibi. Christian and Davon grew up with La'Keyvion's brother, Lavion Goings, and they were friends of the family. Lavion and La'Keyvion lived with their mother Aleena Greene on the southeast side of Chicago. Christian and Davon both lived in Lawndale, where the shooting occurred. Davon lived three houses away from Michael and Travadis, but they were not his friends. Davon testified that his nickname is "Munchie."

¶ 17 The day before the shooting, Christian and Davon went to Aleena's house on the southeast side of Chicago to hang out with Lavion. They got some takeout from a nearby restaurant and spent the night. The next day, sometime in the morning or early afternoon, someone called Aleena and told her about the shooting. Christian, Davon, and Lavion went back to Lawndale after they heard that Michael and Travadis had been shot. Davon testified that they took public transportation; La'Keyvion testified that Aleena drove them. La'Keyvion also testified that Aleena and Lavion told the police about Christian's and Davon's whereabouts at the time of the shooting.

¶ 18 Davon testified that they got back to Lawndale at 1:10 p.m.; he knew because he asked the "train lady." They took the CTA to Pulaski Road and 21st Street. The shooting took place at 2126 South Harding Avenue; Harding Avenue is one block east of Pulaski Road. They walked toward Davon's house at 16th Street and Komensky Avenue. They stopped somewhere along the way so Davon could talk to someone named "Snuggles"; meanwhile, Christian and Lavion hung out on the block. They all got back to Davon's house around 3 p.m.

¶ 19 The witnesses had various estimates of the time of the shooting. Darnise Riley, Michael's and Travadis's mother, testified that she learned of the shooting on a phone call around 11:40 a.m. Davon testified that the call to Aleena about the shooting was at approximately 11 a.m.; La'Keyvion testified it was in the afternoon, sometime between 1 p.m. and 3 p.m. Detective Rios, who testified with the benefit of his reports, said the shooting took place around 1 p.m. Michael testified it was around 3 p.m.

¶ 20 Michael had a cousin named David Stuart, also known as "Little Dave." The defense sought to cross-examine Michael about his alleged dealings with "Little Dave." In an offer of proof, the defense asserted that Michael's father had indicated that Michael sold drugs with "Little Dave" and had been accused of stealing from "Little Dave." The defense argued that the police were aware of this accusation but failed to follow up on it and thus failed to adequately investigate a plausible alternative suspect with a motive to shoot Michael and possibly

Travadis. The defense also argued that because Michael had not been charged with a drug offense, he had a "motive and bias to shade a story to create favor with the State."

¶ 21    The trial court appointed a bar attorney to advise Michael regarding his fifth amendment privilege against self-incrimination before allowing the defense to question him on these matters. When he was recalled to the stand in the defense case, Michael denied that he was ever accused of stealing from "Little Dave," but he otherwise invoked his privilege against self-incrimination and declined to answer any further questions about his alleged drug dealing or involvement with "Little Dave." The defense moved to strike all of Michael's testimony on the ground that he could not be cross-examined about his alleged bias. The trial court denied the motion to strike but said it would consider Michael's assertion of the privilege when weighing his testimony.

¶ 22    The trial court found that Michael's identification of Christian was positive and reliable. In reaching this conclusion, the trial court conducted its analysis entirely within the framework of *Neil v. Biggers*, 409 U.S. 188 (1972), and *People v. Slim*, 127 Ill. 2d 302 (1989). The trial court found that all five of the *Slim/Biggers* factors supported Michael's identification. The trial court paid special attention to one factor—the accuracy of the witness's prior description—and used it as an analytical framework for addressing Christian's challenges to Michael's credibility.

¶ 23                                   II

¶ 24    Christian's principal challenge is to the sufficiency of the evidence. The requirement of proof beyond a reasonable doubt applies in the adjudicatory phase of a delinquency proceeding, just as in a criminal trial. *In re Winship*, 397 U.S. 358, 368 (1970); *In re W.C.*, 167 Ill. 2d 307, 336 (1995). In reviewing the sufficiency of the evidence, we ask whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the essential elements of the crime—including the identity of the perpetrator—beyond a reasonable doubt. *In re W.C.*, 167 Ill. 2d at 336; *People v. Ross*, 229 Ill. 2d 255, 272 (2008); *Slim*, 127 Ill. 2d at 307.

¶ 25    We do not retry a defendant on appeal. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). We remain mindful that the trier of fact heard the evidence and observed the witnesses. *Id.* The trial court's findings on witness credibility, the weight to be given certain testimony, the balancing of conflicting evidence, and the reasonable inferences to be drawn from the evidence are entitled to great deference. *Ross*, 229 Ill. 2d at 272. Thus, discrepancies and omissions in a witnesses' identification testimony do not necessarily create reasonable doubt; they may only affect the weight the trier of fact gives to that testimony. *Slim*, 127 Ill. 2d at 309; *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 50.

¶ 26    But the trial court's findings are not conclusive. *Ross*, 229 Ill. 2d at 272; *Smith*, 185 Ill. 2d at 541-42. If, after a careful review of the evidence, we find that the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt, we must reverse the conviction. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009); *Smith*, 185 Ill. 2d at 542.

¶ 27    The State's case against Christian comprised a single eyewitness identification with no other occurrence witnesses, no physical evidence, no confession, and no evidence of motive. Because Christian's adjudications are based entirely on Michael's identification testimony, the question we must confront is whether a trier of fact could rationally believe that Michael's

testimony, on its own, was sufficiently trustworthy to prove Christian guilty beyond a reasonable doubt. And to answer that question, we must isolate various portions of Michael's testimony.

¶ 28                                                                A

¶ 29    We begin with Michael's initial statement to the police only hours after the shooting. When Michael spoke to Detective Rios in the hospital, he did not say that Christian was involved in the shooting, even though he had known Christian for several years and claimed to have recognized him immediately during the shooting.

¶ 30    The trial court (and the State) discounted this fact with observations that Detective Rios conducted a "preliminary" interview and was not the "lead" detective. But these distinctions strike us as meaningless from Michael's perspective. They cannot explain why he failed to tell Detective Rios that Christian shot Travadis. And it is difficult to imagine that Detective Rios would put off the most basic and pertinent question of all—"Do you know who shot you and your brother?"—thinking this information was best left for another day, when the "lead" detective would conduct a more searching interview. No matter how short or preliminary the interview, if Detective Rios was there to ask Michael anything at all, surely this was at the top of his list.

¶ 31    When asked why he did not identify Christian by name immediately, Michael testified that he "didn't tell [Detective Rios] anything" because he was "trying to get sowed [*sic*] up" and "wasn't trying to talk to anybody at the time." Moreover, Michael "didn't like [Detective Rios's] vibe"; the detective's "aggressive" "approach" made him feel "like [he] was the shooter and not the victim." Detective Rios agreed that Michael, understandably, seemed more interested in his brother's prognosis than in talking to the police.

¶ 32    That answer would make sense had Michael simply refused to talk to Detective Rios. If Michael was in too much pain, or in shock, or feeling defensive in the face of aggressive questioning, or simply too concerned about his brother to think straight, we could understand why he might not speak to Detective Rios in detail, if at all.

¶ 33    But that is not how the conversation played out. Michael *did* speak about the shooting in meaningful detail to Detective Rios. And what he did say (his description of the events), as well as what he did not say (failing to identify Christian by name), was misleading.

¶ 34    According to Rios, Michael gave a narrative account of the incident and a fine-grained description of a lone shooter: a black male, 18 to 20 years old, 5 feet, 4 inches to 5 feet, 5 inches, and 140 to 145 pounds; with a medium complexion and short hair; wearing a red, green, and brown hoodie; and holding a black scarf over his mouth. That description bears little resemblance to Christian or to the description of Christian that Michael gave in later police interviews and at trial. Christian was far younger (14 years old), and though Michael did not know his precise age, he "knew he was young." Christian was 2 inches taller and 20 pounds heavier. Christian was always (later) described by Michael as wearing, at the time of the shooting, a black shirt, brown or tan pants, and black shoes, not a red, green, and brown hoodie. And that is to say nothing of the two features that Michael continually cited as most distinguishing Christian: his hair ("curly straight almost like Hispanic") and his eyes ("darkened eyes," "like raccoon-ish eyes").

¶ 35    The State says that Michael was probably describing, in whole or in part, the *second* shooter to Detective Rios. The trial court thought that might be the case as well, based on Michael's testimony. There are two significant problems with that theory.

¶ 36    The first is that the description that Detective Rios took from Michael bore even *less* of a resemblance to the supposed second shooter than it did to Christian. Michael never mentioned to Rios the "small little nappy fro" that Michael would later cite repeatedly as the distinctive physical trait shared by the second shooter and the young boy from the neighborhood he knew as "Munchie." And while Michael described a shooter who was 5 feet, 4 inches to 5 feet, 5 inches,  and 140 to 145 pounds, the photo array admitted into evidence indicates that "Munchie" was 5 feet, 11 inches and 140 pounds. This disparity is significant. "Munchie" is tall and lanky; the person Michael purported to describe is short and stocky. Thus, Michael's initial description of the shooter does not correspond to any of his later descriptions, or match the actual appearance, of anyone in the record.

¶ 37    The second problem with speculating that Michael might have been describing the supposed second shooter, not Christian, is that Detective Rios was adamant in his testimony that Michael *never mentioned* a second shooter. Michael only described a single shooter in his account of the ambush.

¶ 38    Before the State began to object, defense counsel asked Detective Rios, "how many suspects did [Michael] tell you were involved in the shooting," and he unequivocally answered, "[o]ne." Defense counsel then asked Detective Rios to describe Michael's account of "what the suspect did." Rios responded that Michael said "a male black came out of the gangway from the north side, *** and he started shooting." On three occasions, interspersed with the State's objections, Detective Rios answered "yes" when asked if Michael told him that "the offender shot Travadis first." The offender then fired more shots; Michael stepped in front of Travadis and was shot in the back of the head. In connection with this account of the shooting, Michael described one suspect—whose description, as we have explained, did not resemble Christian (or "Munchie") at all.

¶ 39    So the notion that Michael had been describing the supposed second shooter—the one who shot him, not his brother—holds no water. He only described one shooter to Rios, and that description bore no resemblance to either Christian or the second shooter Michael tentatively identified later, "Munchie."

¶ 40    In construing this evidence in the light most favorable to the State, we acknowledge that it would be possible to find an excuse for Michael's failure to identify Christian immediately. Maybe Michael had a knee-jerk instinct not to cooperate with law enforcement. Maybe Michael wanted to seek retribution of his own, outside the justice system, and identifying Christian would interfere with that plan. He may have been fond of Christian and was reluctant, at least initially, to turn him in. Or he may have been scared, thinking that if Christian was acting at the direction of someone else (perhaps "Little Dave"), identifying Christian to the police could endanger his own life. It would not be the first time that a witness declined to cooperate with law enforcement in the apprehension or prosecution of a suspect. See, *e.g.*, *People v. VanZile*, 48 Ill. App. 3d 972, 976 (1977) (witnesses refused to talk to State's investigators); *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 20 (witness refused to testify at trial against great-nephew); *People v. Bueno*, 358 Ill. App. 3d 143, 155 (2005) (witness claimed he could not recall prior statement to police and "refused to testify any further");

*People v. Kruger*, 236 Ill. App. 3d 65, 72-73 (1992) (witness refused to testify at trial after making written statement to police).

¶ 41    But Michael gave none of those reasons at the adjudicatory hearing. As described earlier, he testified that he did not appreciate the detective's attitude and that "[i]t just didn't seem right at the time" to give Christian's name. And even if one or more of the excuses we have posited above were the real reason for Michael not identifying Christian, those excuses would still not explain why Michael, rather than remain mum, gave a wholly inaccurate description of the shooter.

¶ 42    In sum, our first concern with Michael's credibility is his account of the events at the hospital to Detective Rios. He did not identify Christian by name. He did not describe Christian by appearance. He never mentioned a second shooter. And the description that he *did* provide did not even resemble that of the second shooter he later tentatively identified.

¶ 43                                                          B

¶ 44    This bleeds into a second major problem with Michael's credibility—his *testimony at the hearing* concerning the conversation with Rios. Detective Rios's testimony contradicted Michael's testimony about their discussion in several critical ways. The first, as we just discussed, is that Rios swore that Michael only mentioned one shooter. But Michael did more than simply testify that he mentioned two shooters when he talked to Rios; Michael also claimed, at the adjudicatory hearing, that he *described* both of those individuals in specific detail to Rios—the same detail that he gave in later interviews with the police and at trial.

¶ 45    After first claiming that he "didn't tell [Detective Rios] anything" because he was "trying to get sowed [*sic*] up" and "wasn't trying to talk to anybody at the time," Michael went on to testify that he not only spoke to the detective but did so with precise accuracy, insisting that he provided the same description of Christian to Detective Rios that he has given all along. In particular, Michael said that he told Detective Rios that Travadis's shooter (*i.e.*, Christian) wore brown pants, black gym shoes, and a T-shirt; had dark spots under his eyes; appeared partially Hispanic; and was younger than 18-20 years old. This testimony, however, was rebutted by Detective Rios, who testified, with the benefit of his report, that Michael included *none* of these things in his initial description of the incident and the single shooter.

¶ 46    The State does not contend that its police officer, Detective Rios, an 11-year veteran detective, was not credible, or even that his account was wrong. Nor did the trial court question the credibility of the detective—the court described him as a "very 'no-nonsense' and a 'just the facts' type of individual."

¶ 47    It is impossible to credit *both* Rios's and Michael's testimony, when they varied so wildly. We have already noted the trial court's primary attempt at reconciling their testimony, echoed by the State—that when Rios was describing the shooter, he was describing not Christian but the second shooter. But we have already rejected that rationale, for Detective Rios could not have been clearer that Michael only described *one shooter* at the scene, and that description did not match either Christian or the supposed second shooter, "Munchie."

¶ 48    Just as importantly, the trial court did not reconcile Michael's testimony at trial that he gave Rios a detailed description of Christian—his relative age, the black shirt and brown pants and black shoes, not to mention the particularly unique "raccoon-ish" eyes and "Hispanic-looking" hair—with Rios's testimony that Michael provided absolutely *none* of that

information. Rios could not recall any such information, nor did his notes reflect any such information, which would have clearly stood out to the detective had it been provided to him.

¶ 49    It would be one thing had the trial court found Detective Rios incredible for whatever reason—dishonesty, incompetence, or that he was merely confused—and determined that Michael was more credible. But there was no such finding by the court, nor does the State contend as much. And the explanations we have been given for the inconsistencies are unsatisfactory.

¶ 50                                                    C

¶ 51    We now turn to later interviews Michael gave with Detective Galliardo and an unnamed, third detective, as well as his conversation before the adjudicatory hearing with prosecutors.

¶ 52    Briefly, having previously recounted this information, after his initial interview with Rios on July 29, 2015, Michael testified that he met with Detective Galliardo and another detective on August 3, 2015. In that August 2015 interview, Michael testified that he identified Christian by name and description: fair, Hispanic-looking hair and "raccoon-ish" eyes; a black shirt; brown or tan pants; and black gym shoes. Michael also told the detectives that there was a second shooter, another young boy from the neighborhood known as "Munchie," whose real name, he believed, was Davon McGee. Within a week, Michael was shown two lineup arrays. He positively identified Christian in one of the photo arrays and tentatively identified "Munchie" from the other, without giving a positive identification.

¶ 53    Eleven months passed. Michael met with prosecutors, preparing for trial, on June 29, 2016. Michael testified that prosecutors informed him that Davon McGee had an alibi for the shooting (the same alibi, as we previously noted, as Christian—something that was not further explored during the hearing).

¶ 54    In response to learning that Davon McGee could not have been the second shooter, Michael told prosecutors that the second shooter was *Donovan* McGee, not Davon McGee. *Donovan* McGee, he told prosecutors, had dreadlocks, not short hair. *Donovan* McGee, he told prosecutors, was not the same person as Davon McGee. They did, however, happen to both answer to the nickname "Munchie."

¶ 55    When testifying at trial about this June 2016 meeting with the prosecution, Michael said that he mentioned dreadlocked Donovan instead of short-haired Davon because Detective Galliardo had provided him that information in their interview 11 months earlier:

> "I told the State [on June 29, 2016] I thought the guy had dreadlocks because that's what—the detective—one of the detectives—I think his name was Galliardo—Galliardo, right? And he was telling me—when he came and did the interview with me [in August 2015], he was saying actually that people was telling him that the shooter had dreads. I explained to him that I—that ain't what I seen and that all I know is—I remember the guy Munchie.
>
> And so once he said that, I kind of went with that; but I wasn't—I was never one hundred percent sure about the guy had dreads. *** And then when the detective came back and gave me some information about other people he had interviewed or what not, I did go with the dreads because I guess that's what he thought—by everybody telling him that's what really was going, the person had dreads, so I kind of got confused by the officer coming to tell me what other people were saying."

¶ 56 And though Michael, by his own admission, told prosecutors that Donovan McGee and Davon McGee were two different people on June 29, 2016, he testified at the adjudicatory hearing—one month later—that he believed them to be one and the same person.

¶ 57 This testimony casts serious doubt, by itself, on Michael's credibility. First, if we are to believe Michael here, Michael admittedly was willing to change his story and falsely identify a different individual as the second shooter based on what a police detective told him. To be fair, he did not *positively* identify that second shooter, but he identified him no less. He told prosecutors that Davon and Donovan were different people, though he did not believe that to be true. He told them the second shooter had dreadlocks, though he did not believe that to be true.

¶ 58 Michael's stated reasons *why* he lied do more harm than good to his credibility. First, he claimed confusion. He said he mixed up the similar names "Davon" and "Donovan." And this Davon/Donovan individual—"Munchie"—used to have dreadlocks before apparently getting a haircut. In other words, Michael claimed at trial that there was only one "Munchie" but the names and former-versus-current hairstyles of that individual threw him off during the meeting with prosecutors a month before trial.

¶ 59 The trial court accepted that explanation. We cannot.

¶ 60 First, we have been provided no adequate explanation why Michael would respond to the information conveyed by prosecutors—that the person Michael tentatively identified as the second shooter, Davon McGee, had an alibi—by giving the second shooter a new name and hairstyle. The only plausible conclusion we could draw is that Michael was trying to identify a different person to prosecutors—which in fact is *exactly what he told prosecutors*, that they were two different people.

¶ 61 And while it might be understandable that Michael might have confused the similar names "Davon" and "Donovan," no amount of confusion could explain why he now remembered the second shooter as having dreadlocks, not short, inch-high hair. His attempt to explain away that discrepancy by suggesting that "Munchie" used to have dreadlocks, then got a haircut, does nothing to help him. Whatever hairstyles the second shooter *once* wore, Michael saw short, inch-high hair on *the day of the shooting*, yet he told the prosecutors a month before trial that the second shooter wore dreadlocks. The trial court did not mention the hairstyle discrepancy in attributing Michael's see-sawing account to "confusion."

¶ 62 And then, of course, there is Michael's claim at trial that he was fed facts by the detectives at the August 2015 interview and he "went with that," as we recounted at length in the block quote above. If Michael was lying about police fact-feeding, that is yet another mark against him at trial, another example of false testimony. If he was telling the truth, then he admitted to bending and shaping his story based on what the police told him.

¶ 63 Was Michael telling the truth about police fact-feeding? The trial court mentioned it briefly as one of the reasons Michael was confused, presumably accepting that piece of Michael's testimony as true in doing so, and otherwise not commenting on it.

¶ 64 The State, we would note with some interest, does not disavow this portion (or any portion) of Michael's testimony, either. In fact, the State embraces it, reciting Michael's testimony about police fact-feeding and then calling him "honest and forthcoming" about it. We will say this much for this apparent concession by the State, Michael's claim of being fed such facts as the dreadlocks by the police was certainly *unrebutted* in the record—unrebutted, that is,

because the State apparently saw no reason to call either the detective Michael accused of fact-feeding—Detective Galliardo—or Galliardo's unnamed partner. Of course, the State is not required to call any particular witness, but we do find it troubling that the State remained mute in the face of that serious accusation by a witness for the State—a witness on whose credibility the entire case turned.

¶ 65   So the trial court seemed to believe that the police fed Michael facts at the August 2015 interview, and the State accepts it as fact. And both the court and the State embraced it as an excuse for Michael's confusion.

¶ 66   If it is true—if Michael was being "honest and forthcoming" about fact-feeding by the police at the August 2015 interview, it follows that Michael was *not* being honest and forthcoming with prosecutors in June 2016 when he told them two things he did not believe to be true—that the second shooter had dreadlocks and that Davon and Donovan were two different people. If Michael was being "honest and forthcoming" at trial about police fact-feeding, then he was admitting to tailoring his testimony away from his memory and belief based on what the police had told him and thereby accusing someone falsely of attempted murder.

¶ 67   Christian wants us to go further. He says that if Michael was contaminated by police suggestiveness regarding "Munchie," it follows that Michael's identification of Christian is tainted, too. It is impossible to believe, says Christian, that the same detective who fed Michael facts about one shooter "scrupulously avoided contaminating him" with facts about the other shooter, especially when Michael's description of the events and shooter(s) changed so dramatically upon meeting with that very officer.

¶ 68   To be sure, it was during that August 2015 interview with Detective Galliardo that Michael first identified Christian by name and description. Before that interview (where, apparently, the fact-feeding occurred), Michael had not identified or remotely described Christian. It would be tempting, as Christian argues, to paint that entire interview with a broad brush of taint and infer that the police may have given Michael *Christian's* name and description, too. But the trial court obviously did not see things that way; though the court barely mentioned the rather disturbing (and conspicuously unrebutted) allegation of police fact-feeding, the trial court clearly accepted Michael's identification of Christian, the only person on trial.

¶ 69   So we will not go as far as Christian would take us. Suffice it to say, however, that (1) Michael admitted to lying to sworn law enforcement officers a month before trial about the identity of an attempted-murder suspect and (2) either he was willing to bend his testimony at the suggestion of police detectives, or he is lying about that reason, neither of which inspires any confidence in his overall credibility.

¶ 70   The trial court contrasted Michael's testimony about the second shooter with his testimony regarding Christian. The court noted that, however Michael may have wavered about the second shooter, he refused to positively identify the second shooter, and yet he remained steadfast in his positive identification of Christian. Specifically, the court found Michael's identification of Christian credible in part based on Michael's "candidness about his uncertain identification of the second shooter," contrasted with the fact that Michael "never wavered in his identification of" Christian.

¶ 71   We can only assign so much weight to this reasoning. First, Michael *did* waver in his identification of Christian; he left Christian entirely out of the critical first interview about who shot him and his brother. He did not even describe Christian, much less identify him by name.

- 11 -

¶ 72    And Michael's supposed "candor" about his inability to positively identify the second shooter should be placed in context. Michael, who never even mentioned a second shooter at the first interview, then made his first, tentative identification of "Munchie" at the August 2015 interview, where he mentioned a "Munchie" with very short, inch-high hair. Yet it was at that very same meeting, according to Michael himself and unrebutted (indeed, conceded) by the State, that the police told him the second shooter wore dreadlocks. So *of course* Michael would not have been sure about the second shooter. He described the young man as having inch-high hair, and the police were telling him he had *dreadlocks*.

¶ 73    And 11 months later, when Michael met with prosecutors, they told him that the person he had originally identified—Davon McGee—had an alibi and could not possibly have been the second shooter.

¶ 74    So we are not as willing as the State and the trial court to give Michael points for being unsure about the second shooter. No reasonable person would think he could be sure about an identification when, every time he discussed it with law enforcement, he was told he was flat wrong. This is less a case of a witness being careful and cautious with his identification and more of one where the witness kept getting shot down every time he tried to make an identification of the second shooter. We do not see how Michael's uncertainty about the second shooter, in this context, bolsters his credibility.

¶ 75    We should emphasize here that we are taking the record as it was presented to us. We do not know that police detectives actually fed Michael information that tainted his story. He said they did, and both the trial court and the State seem to accept that as gospel, but still we are not prepared to state that serious and disturbing allegation as fact. But we have analyzed the evidence as if it were. The State uses that fact as part of its argument why Michael should be believed, as did the trial court, and it is our duty to take the evidence in the light most favorable to the State. Apparently, the State believes that the best way to explain Michael's about-face to prosecutors in June 2016 is to accept that police fact-feeding occurred in August 2015. And of course, if it is *not* true, then it is another example of Michael testifying falsely, which likewise would diminish his credibility significantly. There is no outcome on this police-fact-feeding question that favors Michael's testimony.

¶ 76    In the end, police fact-feeding or not, it is still undisputed that Michael gave prosecutors a different story about the second shooter than he gave to detectives 11 months earlier. Fact-feeding or not, it is undisputed that Michael lied more than once to law enforcement regarding the second shooter.

¶ 77    The only other point made by the trial court and the State is that the second shooter was not on trial here, something akin to a relevance objection. But we have already expressed concerns regarding Michael's identification of Christian, both the inconsistencies and omissions in what he told the police and his incredible testimony at the adjudicatory hearing concerning that interview. His testimony regarding the second shooter is simply another aspect of his testimony bearing on his credibility; we can think of no reason, nor has one been supplied to us, why the entirety of Michael's testimony and police statements would not be relevant in assessing Michael's credibility.

¶ 78    We have afforded the State every reasonable inference in an attempt to untangle Michael's testimony and parse together a plausible argument for upholding this conviction. But in the end, we can only conclude that Michael was not a credible witness. His testimony was subject

to considerable doubt at every turn. Our concerns are too many and run too deep for us to have any confidence in his testimony.

¶ 79      And yet the State's case rested entirely on that testimony. The State did not produce any other eyewitnesses or any physical evidence—no weapon, fingerprints, DNA, gunshot residue, or the like. Christian did not make any inculpatory statements. There was no evidence of motive. See *People v. Starks*, 2014 IL App (1st) 121169, ¶ 47 ("While it is not necessary for the State to prove a motive for a crime [citation], the lack of any identifiable motive can certainly give rise to a reasonable doubt."). And the State did not even produce the detectives who were present when Michael implicated Christian. As a result, neither Michael's identification of Christian nor his testimony about the circumstances of those interviews was supported by any corroborating evidence.

¶ 80      We hold that the State's evidence was so unsatisfactory as to justify a reasonable doubt of Christian's guilt. *Siguenza-Brito*, 235 Ill. 2d at 225; *Smith*, 185 Ill. 2d at 542.

¶ 81                                                    D

¶ 82      We have not addressed the five-factor balancing test to support a single-eyewitness conviction from *Biggers*, 409 U.S. 188, and *Slim*, 127 Ill. 2d 302. Christian says that we should not employ the test at all, that it has been rendered obsolete in light of the Illinois Supreme Court's holding in *People v. Lerma*, 2016 IL 118496.

¶ 83      We need not decide that question because we do not find it necessary to run our analysis through the analytical framework of *Slim* and *Biggers*. The "linchpin" of this five-factor test is the "reliability" of the eyewitness identification. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). We have already outlined our reasons why we have found that Michael's testimony lacks sufficient reliability to support the adjudication of delinquency—the numerous and troubling contradictions and inconsistencies in his overall testimony. Whether Michael's testimony passed or flunked the five-factor test would add nothing to our analysis at this point.

¶ 84      To be sure, before *affirming* a conviction based on a single eyewitness's testimony, a reviewing court must ensure that the *Slim* factors, on balance, have been satisfied; we cannot uphold a conviction in this context unless we have confirmed that the evidence supporting the conviction was sufficiently reliable. See *Slim*, 127 Ill. 2d at 307 (single witness's identification will support conviction only if witness's identification is credible and reliable). Had we affirmed Christian's adjudications, we would not have done so without first confirming that the conviction satisfied the *Slim* balancing test.

¶ 85      But it does not follow that a reversal for insufficient evidence, in a single-eyewitness case, could only be based on a *failure* of the *Slim* factors. We are aware of no case law that suggests that we cannot find a lack of credibility for other reasons independent of the five-factor test, such as inconsistencies and discrepancies in the overall testimony of the single eyewitness. Indeed, we have many examples where our supreme and appellate courts have done just that. See, *e.g.*, *Smith*, 185 Ill. 2d at 545 (without reaching *Slim* test, finding sole witness to shooting so lacking in credibility, given "serious inconsistencies in" and "repeated impeachment of" her testimony, that no trier of fact could have found her reasonable); *People v. Schott*, 145 Ill. 2d 188, 206-07 (1991) (holding that sole eyewitness's testimony was "so fraught with inconsistencies and contradictions" that reasonable doubt of guilt remained, without discussing *Slim* factors); *People v. Hernandez*, 312 Ill. App. 3d 1032, 1037 (2000) (murder

- 13 -

conviction based on single eyewitness testimony reversed, without conducting *Slim* analysis, based on implausibility of witness's testimony).

¶ 86    As in those cases, without explicitly detailing the *Slim* factors, we have found that the significant discrepancies and inconsistencies in Michael's testimony have so compromised his credibility that, absent any corroborating evidence whatsoever, a reasonable doubt of Christian's guilt remains. We thus reverse Christian's adjudications of delinquency.

¶ 87                                                           III
¶ 88    Respondent's adjudications of delinquency and disposition are reversed.

¶ 89    Reversed.