2018 IL App (1st) 152413

THIRD DIVISION
June 29, 2018

Nos. 1-15-2413 and 1-15-2488, Consolidated

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 09 CR 15218 |
| | ) | |
| ANDREW DAVIS and | ) | |
| DONATE GRAHAM, | ) | Honorable |
| | ) | Lawrence E. Flood, |
| Defendants-Appellants. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court, with opinion
Presiding Justice Cobbs and Justice Fitzgerald Smith concurred in the judgment and opinion.

OPINION

¶ 1    The State charged defendants Andrew Davis and Donate Graham with first degree murder for the shooting death of Mark Cooper and attempt (murder) for the shooting of Rakyah Whittier. Following separate but simultaneous jury trials, the circuit court of Cook County convicted Davis and Graham of murder and attempt (murder). The court sentenced Davis to a total of 55 years' imprisonment for murder and 25 years' imprisonment for attempt murder with the sentences to run consecutively for an aggregate sentence of 80 years. The court sentenced Graham to a total of 50 years' imprisonment for murder and 25 years' imprisonment for attempt (murder) to run consecutively. Defendants appealed. This court consolidated defendants' appeals. For the following reasons, we affirm.

¶ 2                    BACKGROUND

¶ 3    We begin with a brief overview of the events leading to this case and a discussion of the evidence adduced at trial. Additional facts will be discussed in connection with the issues to which they pertain. On April 8, 2009, two men wearing "hoodies" which covered their heads

exited a fenced area between two homes across the street from Burnside Park in Chicago. The two men were armed with handguns and started shooting in the direction of the park. A bullet struck Mark Cooper in the head, killing him. Rakyah Whittier suffered gunshot wounds to the buttocks and hip.

¶ 4    Patrick Stribling spoke to police, gave a written statement, and testified before a grand jury. Stribling was in the park at the time of the shooting and believed he was an intended target of the shooting. Just over a week after testifying before a grand jury, someone shot and killed Stribling. An off-duty police officer was working as private security in the area of the shooting in the park when he heard a radio dispatch of shots fired. He then saw a vehicle matching the description of the vehicle seen in the area of the shooting driving past him at a high rate of speed.

¶ 5    Before trial, the State filed a motion *in limine* to admit Stribling's grand jury testimony under the forfeiture-by-wrongdoing doctrine. Following arguments, the trial court granted the motion. The State also filed a motion *in limine* to admit gang evidence. The court also granted that motion. The case proceeded to simultaneous separate jury trials. The pertinent occurrence witnesses at defendants' trials were Rakyah Whittier, Archie McKnight, and Ronald Brown.

¶ 6    Whittier testified he was in the park on the night of the shooting. He described houses across the street from the park. The deceased, Cooper, was there along with Stribling, and Ronald Brown. Whittier was sitting on a bench while Cooper and Stribling were standing by a tree when Whittier heard gunshots. Whittier first heard approximately three gunshots, but someone in the park said the noise was firecrackers. Then he heard approximately 14-15 more gunshots. Whittier looked across the street and saw two people wearing black hoodies coming from the gangway between houses across the street from the park. Whittier and others ran to the back of the park where a gate was located, but he could not jump the gate because he had been

shot. Whittier testified he waited approximately five minutes then walked to the front of the park. He heard people shouting that Cooper was dead. Whittier was walking out when police arrived. He told one of them he had been shot. An ambulance came and took Whittier to the hospital. Whittier testified Stribling was a member of the Gangster Disciples gang. Whittier testified there was a rumor in the neighborhood that the Gangster Disciples were in a war in his neighborhood with the Four Corner Hustlers gang. Whittier identified pictures of the area of the shooting, including the area where the shooters stood. Whittier testified he was not "trying to look over at" the shooters and was not trying to pay attention too closely to them.

¶ 7    On cross-examination by defendant Graham, Whittier testified he could not tell if the shooters were Black or White, or male or female, because they had the hoods of their hooded sweatshirts up and he ran when he heard the gunshots. Whittier stated Mark Cooper (who he called "Ducey") was not in a gang. On cross-examination by Davis, Whittier testified he smoked marijuana when he got to the park. Whittier did not see Archie McKnight in the park but he did see Ron Brown. Whittier repeated his testimony that because the shooters had their hoods up he could not see their faces, their race, or their sex.

¶ 8    Archie McKnight testified he knew Mark Cooper, Whittier (nickname Doobie), Ronald Brown (nickname Chillie), and Stribling. McKnight identified defendants Davis (nickname Bay Bay) and Graham in court as people he knew. McKnight could not recall defendants being in a gang. At the time of the shooting, McKnight was 16 years old. He arrived at the park on the day of the shooting during twilight hours. Several people were sitting around when he heard gunshots. McKnight could not immediately tell where the gunshots were coming from because when the shooting started he "hit the dirt." McKnight looked up from the ground twice but each time there were "sparks coming from the gun." He saw the shots coming from the right side of a

house. During the first couple of shots McKnight saw black hoodies and a caramel colored hand holding a gun in the same spot the shots were coming from. McKnight testified he saw the black hoodies "running back to the gate" then he saw "a white truck scratch off, a white Suburban" through the alley. The prosecutor asked McKnight whether, when he heard the shots and saw the sparks coming from the gun, he saw Davis at anytime. McKnight responded he saw a "like seven feet tall guy" but he did not see Davis. McKnight also testified that he did not see Graham at any time after the shots went off. After the shots stopped and the vehicle drove off McKnight ran to the back of the park. When he got to the back of the park, Whittier said Cooper was shot. McKnight went back and saw Cooper "laid out."

¶ 9    McKnight admitted on direct examination that he spoke to two police officers in connection with this case. Police picked up McKnight, Brown, and Warren Magnum and took them to a police station. McKnight stated he talked to police about the shooting of Cooper because police said they were looking for him and would have a warrant issued if they could not find him. McKnight said he did not want to be charged and did not want his friends or anyone else to get hurt. The State asked McKnight directly whether he was saying police threatened to charge him with Cooper's murder. McKnight responded: "They like, they like—I was like, *** a kid at the time, State's Attorney. *** I don't know what I'm doing. I'm just—a man, grown man come pick me up off the street. He like yeah, we know and the other one, [Detective] Forberg, there was another colleague, he came and said he wanted me and Chillie [(Brown)] to come with him somewhere." McKnight testified he told police he saw "some light-skinned hand shooting across the street." McKnight agreed he told Detective Forberg he (McKnight) heard three loud gunshots and looked over and saw a light-skinned black hand with a gun reaching over a gate across the street. McKnight did not recall telling Detective Forberg the gate opened,

but he did recall telling Detective Forberg some people were shooting in the front lawn at the park. McKnight denied telling Detective Forberg a person he knew as Donate [Graham] opened the gate. McKnight said: "No. He [(Detective Forberg)] pointed out some pictures to me and he said these are the guys that we caught that did the (expletive)." McKnight testified Detective Forberg told him "these are the people we are charging with killing your friend." McKnight identified two photographs as the same ones Detective Forberg showed him at the police station. McKnight testified one photograph was of defendant Graham and the other was of defendant Davis. McKnight testified Detective Forberg asked McKnight "do you know this guy [(Davis)]" and McKnight said "yeah."

¶ 10    McKnight did not recall telling Detective Forberg Graham came through the gate with Davis. McKnight testified he recalled telling Detective Forberg "seven foot figure, light-skinned hand come out of the gate followed by another dark-skinned figure with a hoody come out of the gate." McKnight did not recall telling Detective Forberg that both Graham and Davis came through the gate into the front yard of the house across the street from the park; that once he saw Davis come through the gate he knew it was Davis' hand he had seen over the gate; or that once Graham and Davis came into the front yard he jumped over a wooden rail surrounding the play lot in the park for cover. McKnight also did not recall telling Detective Forberg that before jumping over the wall he saw Davis with a gun in his hand shooting toward the park or that he also saw Graham with Davis but was not able to see if Graham had a gun. McKnight testified Detective Forberg never asked him any questions. Forberg only took McKnight to the people who asked the questions.

¶ 11    McKnight agreed an Assistant State's Attorney (ASA) asked him questions about Cooper's murder but he did not know her name. McKnight said the ASA asked him questions

and wrote down his answers "but like she was scribbling over a lot of stuff, too." At the end of that conversation the ASA showed McKnight the statement she wrote out, but McKnight testified "at the time I had an LD education." McKnight explained he was "not proper with reading." When asked if the ASA allowed McKnight to review the statement before she read it to him aloud, McKnight testified: "No, she wrote it down. She didn't read [it to] me. She showed me the paper like and sign this. I was like okay." McKnight did sign the statement, "when she told me she was done writing it." McKnight identified his signature on the typed statement and testified he signed it, but he initially denied initialing handwritten deletions in the statement then stated he did not recall initialing the changes. McKnight testified at trial that he has been learning disabled his entire life. He did not recall telling the ASA who took his statement that he can read and write English.

¶ 12   McKnight testified he told the ASA he heard three loud shots then "hit the dirt." He did not recall telling the ASA that someone he knows as Donate (Graham) opened the gate and that Donate walked through with someone he knows as Bay Bay (Davis). He did identify photographs of defendants Graham and Davis. McKnight did not recall telling the ASA that after Graham opened the gate both Graham and Davis walked through the gangway and into the front yard or that when Davis came through the gate McKnight knew it was Davis' hand he had seen with the gun. McKnight testified he did tell the ASA that when Davis and Graham came into the yard he went behind a little retaining wall for cover and that he could hear more gunshots. He did not recall telling the ASA that before he got on the ground he saw Davis in the front yard of the house across the street and could see a gun in Davis' hand, or that when he saw fire coming from the gun in Davis' hand he could hear gunshots. He could not recall telling the ASA he saw Graham in the yard with Davis but could not say whether Graham had a gun. When

asked if he recalled telling the ASA he saw Davis and Graham run back through the gate they had come through and that he heard a car pull off from the alleyway behind the house, McKnight responded: "I don't recall saying—I recall seeing two figure man running back toward the gangway."

¶ 13    When asked if he told the ASA he could read and write English, and whether he read the first paragraph of the written statement out loud, McKnight testified: "I recall the woman trying to help me read, the state's attorney. She see I couldn't read that good so she started reading herself." He did not recall telling the ASA that everything in the statement was true and correct.

¶ 14    McKnight testified he recalled testifying under oath before a grand jury. McKnight did not recall testifying before the grand jury that Davis was in the Black P Stones street gang and that Graham was in the Four Corner Hustlers gang. He did not recall testifying that nothing obstructed his view of the gate. He did not recall testifying that the first thing he saw was a light-skinned hand reach up over the gate with a gun in it; or testifying that he went down, looked up, and saw Graham open the gate and then Davis stepped in front of Graham and started shooting. McKnight did not recall testifying that at some point he looked back toward the gate and saw Graham come through the gate. McKnight testified he said "a short hooded man." He also did not recall testifying before the grand jury that Davis came through the gate behind Graham or that he did not see anything in Graham's hand or that Davis had the gun in his hand. He agreed he testified before the grand jury that the gun was shooting in Whittier and Cooper's direction.

¶ 15    On cross-examination by defendant Graham, McKnight testified he knew that Stribling was in the Gangster Disciples gang. McKnight testified Warren Magnum told him and Ronald Brown to come with Magnum. McKnight believed they were going to retaliate against the

shooters; he did not know police would be picking them up. McKnight testified "so when the police got involved I got scared." McKnight continued:

> "The police, when they picked me up the police told me was with you all being at the park that day. Me being me, I'm scared, I'm nervous. I'm thinking he's trying to charge me and Chillie [Brown] with it. So he got asking us questions, showing us pictures. I told him a figure, two figures came from the gate, one had a light-skin hand. The light-skinned hand started shooting and then the other small figure man ran back through gate when I lift my head back up, then I heard a suburban scratching off."

¶ 16    McKnight also testified on cross-examination that the shooting started before the lights in the park came on. He stated "it wasn't night when the shooting started. *** We ran to the park and everything and the sun was still right there at the back of the park." McKnight testified that when Detective Forberg picked up McKnight, Brown, and Magnum, McKnight's mother was not with him and police did not bring his mother to the police station. It was dark outside. No family members were with McKnight when he talked to police. He was 15 years old at the time and a freshman in high school on a special education track. McKnight spoke to the ASA at approximately 4:00 a.m. and had not been to sleep from the time police picked him up. McKnight stated: "I was scared they [(the police)] were going to lock me up if I didn't corroborate."

¶ 17    On re-direct examination, McKnight testified he did not recall telling the ASA that he did not speak to police on the night of the shooting because he was scared Davis and Graham might come back and shoot him, too. McKnight agreed that he testified before the grand jury that he

did not talk to police on the night of the shooting as he was scared, because "I'll probably get shot."

¶ 18    Ronald Brown testified he, Graham, and Davis were friends in grammar school. On the night of the shooting he and his friends were hanging out in the park. Brown noticed a truck that kept driving past. He described it as "[l]ike an Escalade or something" that was "tannish gold or something like that." As they were sitting around Brown heard two or three shots, which he thought were firecrackers, then several more shots. After the first two or three shots, Brown saw everyone running, so he lay under the bench until the shooting stopped. After the opening shots, Brown heard "20, 30 more shots after that." The shots were coming from across the street. When asked at trial if he could see anyone across the street, Brown said he saw two figures but he could not get a clear look. Brown testified there is a street light in front of the house where the gunshots were coming from. When the shooting stopped he looked up and saw two guys standing across the street. He stated he could not get a clear picture of their faces. Then he saw them putting their guns in the front pouch of their hoodies and running off. Both guys had guns in their hands. They ran to the back of the house, then Brown heard a car "screech off." Initially, Brown ran to the back of the park, then everyone walked back and saw Cooper shot in the head.

¶ 19    Brown testified he did not stay to talk to police because "I really didn't have too much to tell them;" but someone "kept telling them that I knew what happened and they kept coming to my house." Brown said he went to the police station "to see what they kept going to my house for. I was dodging them, really. I was scared." Brown was asked whether he told police that from his vantage point he saw Graham and Davis come out a gangway gate across the street. Brown stated: "No. When I got to the police station they already had several statements and

them the pictures they showed us." Brown testified he told police he could only see two men, one taller and a lighter complexion than the other shorter, dark-complexion Black male. Brown denied telling police that as the two men exited the gangway and came closer into the front yard he could see that the shooters were Graham and Davis. He also denied telling police that when he believed the shooting had stopped he peeked over the wall and saw the two shooters clearly, or telling police that he saw Graham and Davis with guns and saw them shooting into the park. When asked if he told police he saw Graham and Davis put their guns in their front pockets and run back through the gate, Brown testified he told police he saw two men put their guns in their hoodies. Brown testified he described the men who were shooting and "that's when they [(the police)] told us who was shooting at us." Brown stated: "I just described the tall, light-skinned man shooting and the short, dark-skinned man shooting. They walked up and showed me the two pictures [(of Graham and Davis)] and said these are the guys everybody told us is shooting at the park that day."

¶ 20    Brown identified his written statement to an ASA. When the prosecutor began questioning Brown about what he told the ASA at the police station, Brown agreed that he did tell the ASA what he was asked about at trial. Both defendants' attorneys objected to the line of questioning as eliciting prior consistent statements. In a sidebar, the prosecutor argued she was "laying out the ground work of the whole statement. *** The whole thing in a totality is important to explain what he saw and how he's now flipping." After additional comment by the defense, the trial court stated: "I'm worried about the prior consistent statement is bolstering the witness's testimony. *** I would say now center on the inconsistencies." When questioning resumed, Brown denied telling the ASA at the police station that he could see both men shooting or that he peeked over the wall and could see both men clearly. Brown agreed he identified

photographs of Davis and Graham to the ASA but denied saying he saw both Davis and Graham with guns and that they were both shooting across the street into the park. Brown initially did not agree that he told the ASA he did not talk to police on the night of the shooting because he was afraid Davis and Graham would come back to kill him, testifying that instead he told the ASA "I was scared for someone would come back and kill me." When asked again if he told the ASA he was scared Davis and Graham would come back to kill him, Brown said "Yes." Brown was asked if he read a portion of the statement to prove he could read and write English and he answered: "When they printed it out I signed my name where they told me to sign my name at because it was 5:00, 6:00 o'clock in the morning. I been there for two days. I was ready to go." Brown denied that the ASA read the statement aloud to him or that he could make and initial changes, but he did admit to putting his initials throughout the statement.

¶ 21    Brown was then questioned about his grand jury testimony. Brown agreed that he was asked and gave the answers reflected in his grand jury testimony. The defense again objected and the trial court stated: "My prior ruling was to proceed to the points of impeachment. I'll sustain it as to that." After the trial court sustained another defense objection on the same grounds, the prosecutor asked Brown if he testified at the grand jury that he peeked his head up "and I saw, that's when I realized who the boys was that was shooting the gun," and that who he saw was Graham and Davis, and that they were the same people he had initially seen but did not recognize. Brown stated he was asked those questions and did give those answers. Brown also agreed that he testified at the grand jury that when he saw their faces they still had guns, and that he testified he did not talk to police because he was scared of Graham and Davis. Brown testified at trial that he identified Davis and Graham as the shooters before the grand jury.

¶ 22 On cross-examination by Graham, Brown stated he did not sleep from the time police picked him up in the middle of the night until he finished the statement with the ASA at approximately 6:00 a.m., but police did feed him. Brown testified that approximately a year to a year-and-a-half before his testimony at the trial, he had an asthma attack that left him unconscious for two weeks to a month, had a few drug overdoses after that, and took medication that affected his memory. Brown stated as a result he sometimes cannot remember what happened. On re-direct Brown testified he was under the influence of drugs or alcohol when he spoke to the detective and ASA, but when he testified at the grand jury he was not then under the influence because he believed the effects had worn off after being in the police station all night. On cross-examination by Davis, Brown stated he did not talk to police because he did not think he would be helpful. Brown testified his parents did not accompany him to the police station. He went to the police station late at night and did not sleep. After giving his statement he was taken directly to the grand jury to testify. Brown testified he was not allowed to talk to his parents the entire time. On redirect Brown stated no one forced him to do anything.

¶ 23 The State called former Assistant State's Attorney Jenni Scheck to testify at defendants' trial. Scheck testified she was the ASA who took the statements at the police station. The State moved to admit McKnight's entire written statement into evidence and the trial court granted that motion over the objection of the defendants. (Davis joined in Graham's standing objection to the evidence.) Scheck then read McKnight's written statement to the jury. The statement completed the State's impeachment of McKnight and included the following pertinent statements:

- "Archie [(McKnight)] states that someone he knows as Donate [(Graham)] opened up the gate.

- And that Donate walked through with someone he knows as Bay Bay [(Davis)].

- 12 -

- And he could see a gun in Bay Bay's hand. Archie states that he saw fire coming from the gun in Bay Bay's hand, and he could hear gunshots.

- Archie states that he saw Donate in the yard with Bay Bay, and that he put his head down before he could see if Donate had a gun."

¶ 24    Scheck identified Brown's written statement and the State later moved to admit portions of that statement. Defendants again both requested and were granted standing objections to the evidence. Scheck testified Brown told her the following:

- "[W]hen it seemed like the shooting stopped, he peeked his head over the wall. And he could now see both men clearly;

- he saw both Bay Bay and Donate with guns, and they were both shooting across the street where he was in the park;

- Bay Bay and Donate each put their guns into the front pocket of their hooded sweatshirt and ran back through the same gates;

- he didn't talk to the police that night because he was scared that Bay Bay and Donate would come back and kill him too."

¶ 25    The State called ASA Krista Peterson to complete the impeachment of McKnight and Davis based on their grand jury testimony. Peterson read the transcript of McKnight's grand jury testimony to the jury over both defendants' objection. McKnight told the grand jury the following:

- Andrew Davis' nickname is Bay Bay.

- Davis is in the P. Stones gang.

- Donate Graham is in the Four Corner Hustlers gang.

- After he went to the ground he looked up and saw Donate open the gate.

- Bay Bay took two steps in front of Donate and started shooting.

- At some point he looked up over the wall.

- When he looked up over the wall he saw Donate come through the gate.

- Bay Bay came behind Donate.

- He did not see anything in Donate's hand at that time.

- Bay Bay had the gun in his hand and was shooting.

¶ 26    Peterson also presented Stribling's testimony to the grand jury.  A different ASA took a written statement from Stribling, and that statement was admitted into evidence.  The trial court also admitted the transcript of Stribling's grand jury testimony into evidence over defendants' objection.  Before Peterson read the transcript of Stribling's grand jury testimony, the trial court instructed the jury that it had before it evidence that a witness who is deceased made statements relating to the offenses charged in the indictment.  The court instructed the jury it had "to determine what weight should be given to the statements.  In determining the weight to be given to the statements, you should consider all of the circumstances under which it was made."  Stribling told the grand jury, in pertinent part:

- A gold SUV drove past the park twice and turned down an alley.  Within two minutes there were three gunshots.

- He saw flashes in front of him and knew they were gunshots from the gangway.

- He saw Donate come out of the gate and Bay Bay, who he knew to be Davis, came out behind him and started shooting.

- Bay Bay's hood flew off when he came out of the gate.

- Bay Bay was running toward the park shooting.

- Stribling was lying on the ground looking directly at Bay Bay while he was shooting.

- 14 -

- When Bay Bay finished shooting Stribling looked up and saw Donate right behind him.

- He was not sure if Donate had a gun.

- He saw Donate run in the gangway and saw Bay Bay put his hood on and run through the gangway.

¶ 27    Following trial, defendants were found guilty of murder and attempt (murder) and sentenced by the trial court. This appeal followed.

¶ 28                                         ANALYSIS

¶ 29    On appeal, both defendants challenge (1) the trial court's decision to admit Stribling's grand jury testimony under the forfeiture-by-wrongdoing doctrine and (2) the sufficiency of the evidence to sustain their convictions. Graham additionally asserts (3) the trial court erred in allowing inadmissible prior consistent statements into evidence, and (4) he was denied a fair trial by improper comments the State made during closing argument. Davis separately argues (5) the trial court erroneously allowed the State to elicit gang information and (6) the court imposed an unconstitutional *de facto* life sentence. We will first address defendants' common arguments, then move to a consideration of their individual arguments.

¶ 30                                1. Forfeiture By Wrongdoing

¶ 31    Defendants argue the trial court erroneously admitted Stribling's grand jury testimony under the forfeiture-by-wrongdoing doctrine because the State failed to prove that either of them performed any act or was in any way involved in Stribling's death.

¶ 32    Prior to trial, the trial court conducted a hearing to determine the admissibility of Stribling's grand jury testimony under the doctrine of forfeiture by wrongdoing. The following evidence was adduced at the hearing. Detective Brian Forberg testified the area surrounding Burnside Park where the shooting occurred is known as "The Triangle." The Gangster Disciples

and Four Corner Hustlers street gangs are active in that area, as well as some Black P. Stones gang members. In April 2009, the Gangster Disciples and Four Corner Hustlers were in a "kind of rivalry." Forberg testified that most of the people involved in the rivalry were former friends and associates of each other but some had split off to join the Four Corner Hustlers. Forberg was assigned to the homicide of Cooper and the shooting of Whittier. He learned some information about what happened from speaking with Warren Magnum and police on the scene. Forberg's partner, Detective Otto, interviewed Whittier at the hospital. Whittier told Otto the shooting was the result of an ongoing conflict between the Four Corner Hustlers and the Gangster Disciples. Forberg and another detective, Detective Eberle, spoke to Magnum close to midnight on the night of the shooting. Forberg and Eberle had been touring the area of the shooting when they saw an individual on the sidewalk who appeared to be very upset being comforted by other people. The detectives slowed their vehicle and Magnum approached them. Forberg later learned that the person who appeared to be upset was Stribling. When they saw Stribling on the street and Magnum spoke to them at their vehicle, Magnum told the detectives that the shooters were people he knew as Donate and Bay Bay. Magnum also said that "all the guys there *** that are now shooting at each other *** all were friends in the past." A group of them had come under the influence of a Four Corner Hustler named Bobby Jones "from the other side of the viaduct" who "was trying to expand into the Triangle. And he was using these younger guys *** to further his criminal agenda, so to speak." Magnum also referred to individuals Forberg learned to be Caleb Charleston and Jeff Allen. Magnum told Forberg that Graham, Davis, Allen, and Charleston were all friends, fellow Four Corner Hustlers, and all under the influence of Jones. During his investigation Forberg spoke to Cooper's mother. She told Forberg that Stribling called her and told her he was upset because Stribling believed he was the target of the

shooting and Cooper was not involved in the rivalry in the neighborhood.  Stribling told Cooper's mother he wanted to cooperate but he was afraid.

¶ 33    Forberg eventually interviewed Stribling about Cooper's homicide.  Stribling also gave the names Donate and Bay Bay.  Forberg learned that Donate and Bay Bay were Donate Graham and Andrew Davis.  Forberg testified Stribling told him that a few hours before the shooting Stribling was hanging out in front of a liquor store when he saw a gold sport utility vehicle drive by being driven by Charleston with Graham in the front seat and a third person in the back seat.  Stribling could not tell who was in the back seat.  Later Stribling saw the same gold SUV drive down Greenwood and turn into an alley.  Moments later Graham and Davis exited the gangway and began firing at the people in the park.  Stribling told Forberg he was a member of the Gangster Disciples.  Stribling knew Graham and Davis from hanging out together in the neighborhood before the separation.  Stribling knew Graham and Davis to be members of the Four Corner Hustlers gang.  A month later Forberg picked up Stribling and brought him to the administration building at 26th and California where Stribling first gave a written statement then testified before the grand jury.  Forberg testified that as he and an assistant state's attorney were driving Stribling home, Stribling expressed concern he would be shot for cooperating with police.  He specifically feared retaliation by the Four Corner Hustlers.  Stribling directed Forberg to three or four different locations before he would get out of Forberg's vehicle.

¶ 34    Forberg testified that a little over a week later, Stribling was shot and killed in front of the same liquor store he had been hanging out in front of on the day of the shooting, when he saw the gold SUV drive by.  Charleston and Allen were charged and convicted for Stribling's murder.  On June 11, 2009, four days after Stribling was killed, Forberg interviewed Davis in the Cook County jail.  Forberg spoke to Davis about the shooting while deliberately omitting any

references that might allow Davis to conclude who said what about his involvement. Forberg purposely avoided telling Davis who the witnesses were. Forberg told Davis he had been identified as the shooter and Davis responded by telling Forberg multiple times to "bring Pat forward" or "bring Pat in here." Forberg took Davis to mean Pat Stribling. The State also played recordings of two telephone calls from the Cook County jail that took place on August 17 and 21, 2009, between Graham and an unidentified woman. In the first phone call, Graham told the woman he was jailed for "Ducey's" murder. Graham said the only thing they had on him was Stribling's statement that he did it. Graham said they showed him his picture and Stribling's signature was under the photo. Graham said it would not "stick." In the second phone call, Graham tells the woman he went to court with Davis and he (Davis) was also charged with the murder, but he did not do it. Graham said he would beat the case because no one saw anything and the witnesses are lying. The woman said people were just naming people "who were into it with Pat." Graham said Stribling made "that statement on us" and got killed. Graham said "That's what his a** get." Graham told the woman Charleston was in the jail for Stribling's murder and the woman said Charleston killed Stribling. The woman said Stribling did not die instantly. Graham said they shot him the first time, drove off and turned around to see if he was still breathing, saw that he was, and shot him some more.

¶ 35    After the State played the two phone calls, Forberg testified he learned from detectives investigating Stribling's homicide that when Stribling was killed, a vehicle Charleston and Allen were in drove up to Stribling's location in front of the liquor store and they started shooting. Then vehicle then drove off, turned around, and came back. Forberg believed additional shots were fired when the vehicle returned. In July 2011, Forberg became familiar with Ashmona Williams. Forberg learned that Williams was a link between all of the people involved because

she was friends with both groups of guys including Charleston, Graham, Stribling, and Whittier. Forberg interviewed Williams, who also gave a written statement. Forberg testified Williams told him that she had a conversation with Charleston. Williams knew Charleston and Allen from the neighborhood, although Allen had only started hanging around the neighborhood within the last year or so. In Williams' conversation with Charleston, Charleston told Williams that Davis had told him "that Pat was tricking on them and cooperating with the police," and that Stribling was the only witness. Charleston then told Williams that Charleston was going to look for Stribling and catch up with him. Williams told Forberg that Charleston's statement about catching up with Stribling meant Charleston was going to find Stribling and hurt or kill him. Williams said to Forberg that Charleston was going to hurt or kill Stribling because of Stribling's cooperation with the police and testifying in the investigation of this shooting. On cross-examination, Forberg testified he showed Davis a picture someone used to identify him but Forberg "would flash it to him, so he wouldn't recognize the signature." Forberg said he showed Davis a picture of Davis with Stribling's signature at the bottom. Forberg demonstrated the manner in which he showed Davis the picture, which was described as "holding up the picture and showing it, completely face forward." After showing Davis the picture, Forberg testified that Davis was "in a kind of derisive way, commanding us to bring Patrick forward."

¶ 36    At the conclusion of the hearing, the trial court continued the motion for the parties' arguments. Following arguments, the court took the matter under advisement. At a subsequent court date, the trial court read its judgment into the record. The trial court found that the question becomes whether the State established by a preponderance of the evidence that defendants had engaged or acquiesced in wrongdoing that was intended to and did procure the unavailability of Stribling as a witness. The trial court found both defendants engaged or

acquiesced in wrongdoing that was intended and did procure the unavailability of Stribling as a witness and granted the State's motion to admit Stribling's grand jury testimony.

¶ 37    The common law forfeiture-by-wrongdoing doctrine is an exception to the hearsay rule under which out-of-court statements by an unavailable witness are admissible where the defendant intentionally made the witness unavailable to prevent him or her from testifying. *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 81 (citing *People v. Coleman*, 2014 IL App (5th) 110274, ¶ 133). The doctrine is both an exception to the rule against hearsay and serves to extinguish Confrontation Clause claims. *Id.* (citing *People v. Hanson*, 238 Ill. 2d 74, 97 (2010)). The doctrine is codified in the Illinois Rules of Evidence in Rule 804(b)(5) (eff. Jan. 1, 2011). Rule 804(b)(5) states a "statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" is not excluded by the hearsay rule. Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011). Thus, "[w]hen the State raises the doctrine of forfeiture by wrongdoing, it must prove both the wrongdoing and the intent to procure the unavailability of the declarant" by a preponderance of the evidence. *Perkins*, 2018 IL App (1st) 133981, ¶ 82 (citing Ill. R. Evid. 804(b)(5) (eff. Jan. 1, 2011); *People v. Stechly*, 225 Ill. 2d 246, 278 (2007)). "[W]hen a trial court makes a finding by a preponderance of the evidence, this court will reverse that finding only if it is against the manifest weight of the evidence. [Citation.] A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. [Citations.]" (Internal quotation marks omitted.)." *Id.* ¶ 82 (citing *People v. Peterson*, 2017 IL 120331, ¶ 39). The appellate court may affirm the trial court's evidentiary rulings upon any basis that is supported by the record. *People v. Chambers*, 2011 IL App (3d) 090949, ¶ 21.

¶ 38    Davis argues the trial court erred when it admitted Stribling's grand jury testimony because the State "did not and could not prove" he had any involvement in Stribling's death, he had no intent to procure Stribling's absence, and there is "absolutely no evidence" Davis "affirmatively acted to kill Stribling, or at least agreed that others should make him unavailable." Additionally, Davis argues there was no showing the motivation behind Stribling's killing was to prevent him from testifying.  Graham similarly argues "there was no evidence [he] intended to kill Stribling, much less that he did so in order to prevent him from testifying."  Graham asserts "the State presented no evidence [he] was involved in the fatal shooting of Patrick Stribling." Graham argues his phone calls discussing Stribling show "only Graham's superficial knowledge of the crime, in a discussion of rumors months after the fact," but do not show he played any role in the shooting of Stribling.  Graham further argues that after the decision by the United States Supreme Court in *Giles v. California*, 554 U.S. 353 (2008), "tacit assent to another's plan is insufficient" to satisfy the requirement that the party against whom the statement is to be admitted caused or procured the declarant's unavailability.  Regardless, Graham argues, the State "failed to prove even tacit assent," where the State failed to adduce evidence Graham knew of Charleston and Allen's plan to kill Stribling or that Graham even spoke to Charleston or Allen before the Stribling shooting, "much less that he helped plan the shooting."

¶ 39    The State responds to both defendants' arguments by asserting that "principles of conspiracy liability as set forth in *Pinkerton v. U.S.*, 328 U.S. 640 (1946), are applicable within the forfeiture by wrongdoing analysis;" a defendant waives his or her Confrontation Clause rights when the wrongful procurement of a witness's absence was "in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy;" and, in this case, Stribling's "murder was in furtherance, within the scope, and

reasonably foreseeable as a natural consequence of an ongoing conspiracy of which defendant[s] [were] a member." Specifically, the State argues the evidence shows defendants participated in a conspiracy to kill Stribling at Burnside Park, and then Charleston and Allen "acted in furtherance and within the scope of the original conspiracy when they ultimately shot and killed" Stribling. The State further argues that even if Stribling was not the intended target of the first shooting, Stribling's death was a natural consequence of the ongoing conspiracy to commit a shooting in the park where Charleston and Allen shot and killed Stribling to prevent him from testifying regarding the initial shooting. The State argues that under a conspiracy theory of liability it is not required to show defendants participated in the wrongdoing "or even [had] actual knowledge that the wrongdoing will occur," the trial court could consider the actions of Charleston and Allen in determining intent, and the evidence proves their and defendants' intent to procure Stribling's absence.

¶ 40   In support of its conspiracy theory of liability under the forfeiture-by-wrongdoing doctrine, the State relies on *U.S. v. Cherry*, 217 F.3d 811 (10th Cir. 2000). In *Cherry*, the issue was "whether Rule 804(b)(6) [1] and the Confrontation Clause permit a finding of waiver based not on direct procurement but rather on involvement in a conspiracy, one of the members of which wrongfully procured a witness's unavailability." *Cherry*, 217 F.3d at 815. The government asked the court to adopt the "principles of conspiratorial liability enunciated in *Pinkerton*[],in the context of Rule 804(b)(6) and the Confrontation Clause waiver-by-misconduct doctrine." *Id.* at 816. The *Cherry* court noted that under *Pinkerton*, "conspirators are responsible for crimes committed 'within the scope of the unlawful project' and thus 'reasonably

---

[1]    "In *Stechly*, our supreme court made clear that, as applied in Illinois, the [forfeiture-by-wrongdoing] doctrine was 'coextensive with' Federal Rule 804(b)(6). [Citation.]" *Peterson*, 2012 IL App (3d) 100514-B, ¶ 21 (quoting *Stechly*, 225 Ill. 2d at 272-73).

foreseen as a necessary or natural consequence of the unlawful agreement.' *United States v. Russell*, 963 F.2d 1320, 1322 (10th Cir. 1992) (quoting *Pinkerton*, 328 U.S. at 646-48)." *Id.* at 817. The Tenth Circuit United States Court of Appeals held "co-conspirators can be deemed to have waived confrontation and hearsay objections as a result of certain actions that are in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy." *Id.* at 813. In assessing whether an action is "in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy" (*id.* at 820), "the scope of the conspiracy is not necessarily limited to a primary goal—such as bank robbery—but can also include secondary goals relevant to the evasion of apprehension and prosecution for that goal—such as escape, or, by analogy, obstruction of justice. [Citation.]" *Id.* at 821. Even in the absence of evidence the co-conspirators "had actual knowledge of, agreed to[,] or participated in" the act in question, there is a possibility of waiver under a *Pinkerton* theory if the elements of *Pinkerton*, *i.e.*, scope, furtherance, and reasonable foreseeability as a necessary or natural consequence, are satisfied. *Id.* The *Cherry* court reversed and remanded for a determination of whether the murder of the witness was "within the scope, in furtherance, and reasonably foreseeable as a necessary or natural consequence, of an ongoing drug distribution conspiracy involving the defendants." *Id.* at 822.

¶ 41     Subsequent to the decision in *Cherry*, the United States Supreme Court clarified that application of the forfeiture-by-wrongdoing doctrine requires showing intent to prevent the witness from testifying. *Giles*, 554 U.S. at 361-62 ("The manner in which the rule was applied makes plain that unconfronted testimony would not be admitted without a showing that the defendant intended to prevent a witness from testifying. In cases where the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person

- 23 -

from testifying—as in the typical murder case involving accusatorial statements by the victim—the testimony was excluded unless it was confronted or fell within the dying-declarations exception."). The Fourth Circuit Court of Appeals confronted the intersection of *Cherry* and *Giles* in *United States v. Dinkins*, 691 F.3d 358 (4th Cir. 2012). The *Cherry* court had found that a defendant waives his or her Confrontation Clause rights "when (1) the defendant participated directly in planning or procuring the declarant's unavailability through wrongdoing; or (2) the wrongful procurement was in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy." *United States v. Dinkins*, 691 F.3d 358, 385 (4th Cir. 2012) (citing *Cherry*, 217 F.3d at 820). The *Dinkins* court held that "[w]hile we think that proper application of *Pinkerton* liability standards in the forfeiture-by-wrongdoing context generally will be coextensive with the scope of forfeiture by wrongdoing as articulated in *Giles*, a court's decision under the second prong in *Cherry* must be supported by evidence that the defendant 'engaged in conduct *designed* to prevent the witness from testifying.' *Giles*, 554 U.S. at 359 (emphasis in original)." *Dinkins*, 691 F.3d at 385. The *Dinkins* court held the lower court properly admitted hearsay statements against the defendant "under the forfeiture-by-wrongdoing exception to the Confrontation Clause pursuant to *Pinkerton* principles of conspiratorial liability." *Id.* (citing Fed. R. Evid. 804(b)(6); *Cherry*, 217 F.3d at 820-21). In a subsequent case, the Fourth Circuit clarified its holding in *Dinkins*:

> "In *Dinkins*, this court endorsed a broad understanding of the forfeiture-by-wrongdoing exception, concluding that the exception applies to a defendant whose co-conspirators murdered a declarant intending to prevent him from testifying. [Citation.] Acting in accord with our sister circuits, we held that the principles of conspiratorial liability articulated in *Pinkerton v. United States*, 328

U.S. 640 (1946), essentially imputed the co-conspirators' intent to the defendant for purposes of both Rule 804(b)(6) and the Confrontation Clause. *Dinkins*, 691 F.3d at 384, 386." *United States v. Jackson*, 706 F.3d 264, 268 (4th Cir. 2013).

¶ 42     We hold the trial court's finding that defendants acquiesced in wrongdoing that was intended to, and did, procure the unavailability of Stribling as a witness is not against the manifest weight of the evidence. In determining whether a defendant has forfeited his hearsay objection and rights under the Confrontation Clause under the forfeiture-by-wrongdoing doctrine, "the trial court may consider hearsay evidence, including the unavailable witness's hearsay statements. *Stechly*, 225 Ill. 2d at 278 (citing *Davis*, 547 U.S. at 833); see also Ill. R. Evid. 104(a) (eff. Jan. 1, 2011) (when deciding preliminary questions concerning the admissibility of evidence, 'the court is not bound by the rules of evidence except those with respect to privileges')." *Peterson*, 2017 IL 120331, ¶ 44. First, the trial court in this case heard evidence that supports finding the killing was in furtherance, within the scope, and reasonably foreseeable as a necessary or natural consequence of an ongoing conspiracy to kill Stribling. Stribling testified to seeing Charleston in the vehicle circling Burnside Park on the day of the shooting in the park and to seeing that same vehicle flee the scene after the shooting. Stribling testified to his belief he was the intended victim of the shooting. Therefore, there is evidence to support finding that defendants and Charleston were in a conspiracy to kill Stribling. Charleston's killing of Stribling completed the purpose of the original conspiracy. Second, killing Stribling was undertaken with the purpose of causing Stribling's unavailability as a witness. Williams testified to Charleston's statement that he intended to kill Stribling because Stribling was cooperating with police. Charleston's intent to silence Stribling can be imputed to defendants. *United States v. Thompson*, 286 F.3d 950, 965 (7th Cir. 2002) ("the waiver-by-

- 25 -

misconduct of one conspirator may be imputed to another conspirator if the misconduct was within the scope and in furtherance of the conspiracy, and was reasonably foreseeable to him"). The trial court did not err in admitting Stribling's grand jury testimony. Accordingly, there is no need to discuss whether intent to procure Stribling's unavailability as a witness can be implied from the fact of his murder. In this case, there is evidence defendants' co-conspirator killed Stribling because of his cooperation with police and that intent can be imputed to them. *Id.*

¶ 43                                    2. Sufficiency of the Evidence

¶ 44      Defendants each argue the evidence adduced at trial is insufficient to prove their guilt beyond a reasonable doubt.

> "On appeal, when the defendant challenges the sufficiency of the
> evidence, the reviewing court must determine, after viewing the evidence in the
> light most favorable to the State, whether any rational trier of fact could have
> found the essential elements of the crime beyond a reasonable doubt. [Citation.]
> A reviewing court affords great deference to the trier of facts and does not retry
> the defendant on appeal. [Citation.] '[A] reviewing court must allow all
> reasonable inferences from the record in favor of the [State].' [Citation.] A
> criminal conviction will not be reversed 'unless the evidence is so improbable or
> unsatisfactory that it creates a reasonable doubt as to the defendant's guilt.'
> [Citation.]" *People v. Anderson*, 2017 IL App (1st) 122640, ¶ 38.

¶ 45      Specifically, Davis argues the State failed to meet its burden because the identifications of him as a shooter were "inconsistent and unreliable" where the witnesses recanted their identifications at trial, the testimony at trial "was markedly different from prior statements," Stribling's identification was not subject to cross-examination, and where no scientific or

physical evidence linked him to the crime and he did not confess.  Graham separately argues the only evidence implicating him is "prior statements, given without the scrutiny of cross-examination," and he challenges the reliability of the identifications in the witnesses' out-of-court statements based on the "*Biggers* factors" as well as the fact the witnesses were under pressure to make an identification.

¶ 46     The State cites *People v. Morrow*, 303 Ill. App. 3d 671, 677 (1999), for the proposition that the trier of fact may weigh a prior inconsistent statement introduced as substantive evidence pursuant to section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2014)) in the same manner as direct testimony.  In *Morrow*, to support his contention the testimony was untrustworthy, the defendant placed "much emphasis on the fact [the witness] recanted her testimony at trial" and her "pretrial statements implicating the defendant were admitted as substantive evidence." *Morrow*, 303 Ill. App. 3d at 675.  The defendant argued, in part, that the witness's "unreliable statements were insufficient to convict him, absent some corroborating evidence." *Id.*  The court found that by its verdict, the jury determined the witness was telling the truth when she made her prior statements and [was] lying at trial." *Id.* at 676-77.  The court found "nothing in the record to justify the substitution of [its] judgment for that of the jury with respect to [the witness's] credibility." *Id.* at 677.  Regarding corroborating evidence, the court stated that "[a]ssuming *arguendo* that there was no corroborative evidence, it does not necessarily portend that, as a matter of law, a recanted prior inconsistent statement admitted under section 115-10.1 cannot support a conviction." *Id.*  The court found in that case "the previous inconsistent statements alone were sufficient to prove [the] defendant's guilt beyond a reasonable doubt." *Id.*  The court explained:

" [I]t is the jury's decision to assign weight to the statement and to decide if the statement was indeed voluntary, after hearing the declarant's inconsistent testimony. [Citations.] Once a jury or trial court has chosen to return a guilty verdict based upon a prior inconsistent statement, a reviewing court not only is under no obligation to determine whether the declarant's testimony was 'substantially corroborated' or 'clear and convincing,' but it may *not* engage in any such analysis. (Emphasis in original.) [Citations.]" (Internal quotation marks omitted.) *Id.* at 677 (citing *People v. Curtis*, 296 Ill. App. 3d 991, 999 (1998)).

¶ 47    In *People v. Craig*, 334 Ill. App. 3d 426 (2002), also cited by the State, the court held, citing *Morrow* and *Curtis*, that "additional corroboration is not required and we are not to engage in looking for corroboration." *Craig*, 334 Ill. App. 3d at 440. The *Craig* court further noted that "[i]n light of the fact that *Morrow* follows the guidance from the supreme court in *People v. Wilson*, 66 Ill. 2d 346, 349 (1977) ('whether accomplice testimony, corroborated or uncorroborated, is a satisfactory basis for conviction goes to the weight of the evidence and is, therefore, in the province of the jury or the court'), and that the supreme court denied the appeals in both of these cases ([citations]), we follow that analysis." *Id.* at 440.

¶ 48    The fact the witnesses recanted their identifications at trial and the convictions rest primarily on the witnesses' properly admitted prior inconsistent statements without corroboration does not warrant reversal. Davis' complaint that the witnesses recanted their identifications at trial and gave "markedly different" accounts on the stand fails because by its verdict, the jury determined that McKnight and Brown were telling the truth when they made their prior statements and were lying at trial, and Davis points to "nothing in the record to justify the

substitution of [our] judgment for that of the jury with respect to [the witness's] credibility." *Morrow*, 303 Ill. App. 3d at 676-77. Defendants' argument that no scientific or physical evidence links them to the crime, and they did not confess, similarly fails because "corroboration is not required and we are not to engage in looking for corroboration." *Craig*, 334 Ill. App. 3d at 440.[2] Finally, defendants' argument their convictions should be reversed because they rest, in part, on Stribling's out-of-court statements that were not subjected to cross-examination, also fails.

> "As early as 1878, the United States Supreme Court acknowledged that if 'a witness is absent by [a defendant's] own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away.' [Citation.] *** More recently, the Supreme Court, in *Crawford v. Washington*, recognized that the forfeiture by wrongdoing doctrine, in addition to serving as an exception to the hearsay rule, also 'extinguishes confrontation claims on essentially equitable grounds.' [Citation.]
>
> * * *
>
> [A]lthough left unsaid in *Stechly* as a matter of Illinois law, we now expressly recognize that the doctrine serves both as an exception to the hearsay rule and to extinguish confrontation clause claims." *People v. Hanson*, 238 Ill. 2d 74, 96-97 (2010).

¶ 49 Under the forfeiture-by-wrongdoing doctrine, defendants cannot complain about the inability to cross-examine Stribling. Further, "by [their] own wrongdoing, defendant[s] forfeited

---

[2] The State argues there is physical evidence corroborating the witnesses' testimony in that the number and location of shell casings recovered from the scene corroborates the testimony about the location of the shooters and the number of shots fired.

[their] right to challenge the reliability of [the]statements." *Id.* at 98-99. Moreover, Davis's authorities allegedly supporting his contention the out-of-court statements in this case are insufficient to support his conviction are not persuasive. Only two, *People v. Parker*, 234 Ill. App. 3d 273 (1993), and *People v. Brown*, 303 Ill. App. 3d 949 (1993), involved prior inconsistent statements such as those of McKnight and Brown.

¶ 50    Both *Parker* and *Brown* are distinguishable from this case. In this case, the witnesses' testimony at trial did not cast doubt on the authenticity of the prior statements, as the witnesses' trial testimony did in *Parker*. In *Parker*, one witness who disavowed his prior statement testified at the trial that he was hospitalized for two-and-a-half months for gunshot wounds and signed his statement after only seven days in the hospital. *Parker*, 234 Ill. App. 3d at 275-76. The witness testified at the trial that he was in great pain, could not move, and did not want to be bothered. *Id.* at 276. Another witness in *Parker* testified at the trial that police threatened to arrest him for withholding information if he did not sign a prepared statement they brought to his home. *Id.* at 277. That witness testified he only signed because he was 17 years old, had just been released from the Juvenile Department of Corrections, and was frightened. *Id.* A third witness testified his prior statement was false and police forced him to sign the statement by beating him. *Id.* at 278.

¶ 51    In this case, there was evidence McKnight testified he was learning disabled, had difficulty reading, was 15-years old and did not have a parent present during questioning, and had not slept; however, the ASA who took McKnight's statement also testified McKnight answered questions voluntarily and did not seem tired, and neither did Brown. McKnight testified he was afraid police would charge him with the murder of his friend, but he did not testify police actually threatened him with arrest and there is no suggestion of physical coercion.

- 30 -

Davis does not claim McKnight was sleep deprived when he testified consistently with his written statement before the grand jury. The ASA who took McKnight's statement testified McKnight was answering questions coherently.

¶ 52    In *Brown*, "there was no evidence, physical or otherwise, indicating that [the] defendant committed the crime." *Brown*, 303 Ill. App. 3d at 965. The same is not true here, where Stribling gave an account of the crime and identified defendants as the shooters consistently with McKnight's and Brown's prior statement, and independent evidence corroborated those statements. *Brown* is further distinguishable where, in that case, the sole remaining witness's first statement naming the defendant as the shooter "was not made until nearly two years after the crime occurred." *Id.* at 965. The *Brown* court noted the "fact that a conviction is based primarily on recanted prior inconsistent statements does not as a matter of law mean that the conviction cannot be sustained. [Citations.]" *Id.* at 964. In the particular circumstances of this case, this court cannot say that no rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. See *id.*

¶ 53    Turning to Graham's challenge to the reliability of the identifications in the witnesses' out-of-court statements based on the *Biggers* factors:

> "Illinois applies the following factors to assess identification testimony:
>
> (1) the opportunity the witness had to view the criminal at the time of the crime;
>
> (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. [Citations.] 'A single witness's identification of the accused is sufficient to sustain a conviction if the witness

- 31 -

viewed the accused under circumstances permitting a positive identification.'

[Citation.]" *Id.* ¶ 40 (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972);

*People v. Slim*, 127 Ill. 2d 302, 307-08 (1989)).

¶ 54    Graham argues the witnesses (1) had a poor opportunity to view the offenders where the offenders were approximately 150 feet away, the crime occurred during twilight, the shooters were hearing hoodies, and the witnesses were hiding behind a wall during the shooting; (2) the witnesses' statements show a lack of attention where Stribling and Brown referenced a street light that does not exist, they demonstrated uncertainty as to lighting conditions, Stribling was more focused on Davis than Graham, and the witnesses failed to provide physical descriptions; and (3) the identifications were made six or seven weeks after the shooting.

¶ 55    "[U]nless vague or doubtful, eyewitness identification of an accused, even that of a single eyewitness, will sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 31. "While we must carefully examine the evidence before us, credibility issues, resolution of conflicting or inconsistent evidence, weighing the evidence and making reasonable inferences from the evidence are all reserved for the trier of fact. [Citation.] We will not overturn a conviction unless the evidence is 'so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt.' [Citation.]" *People v. White*, 2017 IL App (1st) 142358, ¶ 14. This court weighs the factors and views the evidence in a light most favorable to the State to determine whether any rational trier of fact could have found the identification was reliable. *Id.* ¶ 20. In assessing whether a witness had an adequate opportunity to view the offender at the time of the crime and the witness's degree of attention, this court considers the witness's testimony he or she had a clear and unobstructed view (*id.* ¶ 16) and whether the

witness "had reason to intently focus on the offender" (*id.* ¶ 17). In this case, both factors weigh in favor of the identifications of defendants.

¶ 56    The witnesses' prior statements indicate they had a clear view of and recognized the shooters. Particularly, Stribling testified before the grand jury that he was looking directly at Davis as Davis fired into the park. The opportunity to view the offender is the most important factor. See *People v. Poratta*, 244 Ill. App. 3d 529, 535 (1993) ("The most important factor is the victim's opportunity to view the assailant at the time of the crime."). The witnesses also had reason to "intently focus," even if briefly, on the individuals trying to shoot them. Any discrepancies in the witnesses' testimony affected only the credibility of the witnesses and the weight to be given their testimony, which are matters for the trier of fact. *People v. Crawford*, 90 Ill. App. 3d 888, 891 (1980); *In re Christian W.*, 2017 IL App (1st) 162897, ¶ 25. The jury resolved any discrepancies in the witnesses' testimony concerning lighting conditions in favor of finding the identifications reliable. We will reverse only where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *In re Christian W.*, 2017 IL App (1st) 162897, ¶ 26. In this case the discrepancies in the witnesses' statements, including the existence of a street lamp in the area of the shooting, do not render the identification evidence unreasonable, improbable, or unsatisfactory such that defendants' convictions must be reversed. Moreover, "[t]he presence of discrepancies or omissions in a witness's description of the accused do not in and of themselves generate a reasonable doubt as long as a positive identification has been made." *Slim*, 127 Ill. 2d at 309. McKnight, Brown, and Stribling all positively identified defendants. Similarly, the absence of physical descriptions does not render their identifications unreliable.

> "It has consistently been held that a witness is not expected or required to distinguish individual and separate features of a suspect in making an identification. Instead, a witness's positive identification can be sufficient even though the witness gives only a general description based on the total impression the accused's appearance made. [Citations.]" *Id.* at 308-09 (citing *People v. Ervine*, 64 Ill. App. 2d 82, 87 (1965)).

The record indicates that McKnight, Brown, and Stribling viewed defendants' features all at once and instantly recognized them. The witnesses positively identified defendants to police, the ASA, and the grand jury. Further, the witnesses were consistent in their descriptions of the shooters' clothing. The absence of precise physical descriptions of the shooters does not make the identifications vague or uncertain. Finally, the time lapse between the shooting and the identifications does not raise a reasonable doubt of defendants' guilt. In *Fields*, this court held:

> "Regarding the length of time between the crime and the identification confrontation, the record indicates that over four weeks elapsed. However, as the State notes, Illinois courts have upheld convictions involving much longer delays. See *People v. Holmes*, 141 Ill. 2d 204, 242 (1990) (and cases cited therein). Accordingly, the time difference does not invalidate the reliability of the identification." *Fields*, 2017 IL App (1st) 110311-B, ¶ 33.

¶ 57                                   3. Prior Consistent Statements

¶ 58    We next turn to a consideration of Graham's argument the trial court improperly allowed the State to bolster the out-of-court identifications with the witnesses' prior consistent statements. Graham argues that after McKnight and Brown recanted their identifications of defendants at trial and the State introduced their out-of-court identifications as prior inconsistent

statements, it "did not stop there—it questioned both witnesses about an array of other, consistent statements in their prior accounts." Graham argues the State had no basis in law for admitting (1) the portions of Brown's prior statements that were consistent with his trial testimony because the State was not responding to impeachment or a defense charge of false testimony or recent fabrication; or (2) McKnight's prior consistent statements because the State's argument in the trial court suggested it was relying on the completeness doctrine, but the completeness doctrine is not applicable here, where the State was not responding to an opposing party's admission of part of a prior statement. Graham argues that given "the close balance of the evidence, the consistent statements might have led jurors to credit the identifications."

¶ 59    "Generally, a party may not bolster the credibility of its own witness on direct examination by introducing his prior consistent statements. [Citation.] 'The danger in prior consistent statements is that a jury is likely to attach disproportionate significance to them. People tend to believe that which is repeated most often, regardless of its intrinsic merit, and repetition lends credibility to testimony that it might not otherwise deserve.' (Internal quotation marks omitted.) [Citation.]" *People v. Anderson*, 2018 IL App (1st) 150931, ¶ 37. "There are two distinct exceptions to this rule: (1) where the prior consistent statement rebuts a charge that a witness is motivated to testify falsely, and (2) where the prior consistent statement rebuts an allegation of recent fabrication." *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 52. "A reviewing court will not reverse a trial court's evidentiary ruling on a prior consistent statement absent an abuse of discretion." *Id.* "Although only the inconsistent portions of a prior statement are admissible, a trial court need not make a 'quantitative or mathematical analysis' of whether a witness's entire statement is inconsistent under section 115-10.1 for the entire statement to be admissible." *People v. Harvey*, 366 Ill. App. 3d 910, 922 (2006) (citing *People v. Salazar*, 126

Ill. 2d 424, 456-58 (1988)). "A circuit court's discretion is not based on a quantitative analysis but a qualitative one. In some circumstances, this court recognizes that a mere tendency to be inconsistent will be enough to admit the statements into evidence and in other circumstances more than a mere tendency would be needed to admit the statements. It is for the circuit court to determine the issue." *Salazar*, 126 Ill. 2d at 458.

¶ 60    The trial court ruled as follows regarding the State's impeachment of Brown:

> "THE COURT: As to Ronald Brown, I am going to allow the State then to use the impeachment from the handwritten statement and not the grand jury.
>
> I find that in the grand jury he has acknowledged the impeachment. And there is no need to go into the grand jury. The handwritten as far as the impeachment portions are concerned in the handwritten statement, the State may go through that."

¶ 61    We reject the State's arguments that: it properly confronted Brown with those portions of his statement, which included his prior consistent statements, on the grounds there were material inconsistencies between his trial testimony and his prior statements; Brown professed to have memory issues; and the State was "properly laying the foundation for impeachment." Brown admitted making some statements that were inconsistent with his trial testimony to police and the grand jury. The State admits the statements at issue were consistent with his trial testimony. Graham characterizes the State's argument that the material inconsistencies between Brown's testimony and his prior statements justify the admission of his prior statements in their entirety as an improper "all or nothing" approach to prior inconsistent statements. We agree. "Section 115-10.1 'required *** the trial court to determine whether the written statement *** was

inconsistent with [the witness's] trial testimony and to admit only those portions which were actually inconsistent.' [Citation.]" *People v. Wiggins*, 2015 IL App (1st) 133033, ¶ 36.

¶ 62    The State improperly relies on the foundational requirements for impeachment with a prior inconsistent statement.  This court acknowledges that part of "the necessary foundation is asking the witness whether he made the inconsistent statement." (Emphasis added.)  *People v. Grayson*, 321 Ill. App. 3d 397, 406 (2001).  However, that is not what occurred here.  The State asked Brown about statements that were not inconsistent with his trial testimony.  Finally, although *Donegan* provides some support that a witness's own claim of coercion may entitle the State to admit consistent portions of the statement that was allegedly coerced to rebut the claim, Brown's testimony in this case does not raise a sufficient claim his prior statements were coerced.  Brown's testimony that he signed the written statement because he had been at the police station for two days and was ready to go home does not necessarily convey coercion such that the State must be allowed to rebut the claim with prior consistent statements.  Compare, *Donegan*, 2012 IL App (1st) 102325, ¶ 14 (witness stated "the information he gave in his handwritten statement was what the police told him to say and that he was threatened by the police with enhanced charges or more jail time if he did not testify before the grand jury").

¶ 63    Having determined that Brown's prior consistent statements were improperly admitted, we next decide whether the error requires reversal.  We have held that "[p]erhaps the most critical fact in determining the degree to which a prior consistent statement deprived a defendant of a fair trial is whether the statement itself had a bearing upon his guilt or innocence. [Citations.]" *People v. Smith*, 139 Ill. App. 3d 21, 34 (1985).  In *Smith*, the "statement was highly prejudicial since it bore directly on the issue of the defendant's guilt." *Id.*  In this case, the facts about which the State improperly adduced Brown's prior consistent statements are

immaterial to defendant's guilt or innocence. Prior to defense objections, the State asked Brown about his prior statements related to where he was sitting, who was present, and whether he heard loud noises he thought was firecrackers before everyone started running. The State also asked about a statement that he saw "the tall, light-skinned boy and a short, dark-skinned boy come out from behind the gate [across the street from the park] shooting." Conversely, the witnesses testified to vague descriptions of the shooters but were impeached with their specific identifications of defendants as the shooters. In this case, there is no "reasonable probability that erroneously admitted testimony contributed to [the] conviction[s]." Compare, *Hudson*, 86 Ill. App. 3d at 340 (statements used "not only to bolster the witnesses' testimony during the State's case in chief but also as substantive evidence of guilt").

¶ 64    Next, the State responds the trial court properly exercised its discretion to admit McKnight's prior statements in their entirety "because the inconsistencies between [McKnight's] prior statements and his trial testimony were essential to defendant's criminal liability." In support of that argument, the State cites *Donegan*, 2012 IL App (1st) 102325. The State argues the basis of the court's decision in *Donegan* was that the witness's trial testimony and prior statements "differed by a crucial fact in the case—namely, whether [the] defendant committed the crime," and attempts to analogize the testimony and statements in this case with those in *Donegan* on that basis. But the *Donegan* court found the trial court did not err in admitting the prior statements specifically because the prior statements were admissible "to rebut" the witness's claim of lack of memory and coercion (see *id.* ¶ 54), not because "the inconsistencies between [the] prior statements and *** trial testimony were essential to [the] defendant's criminal liability." Accordingly, the State's argument fails.

¶ 65    Nonetheless, in this case we find no error in allowing the entirety of McKnight's written statement and grand jury testimony into evidence because the trial court "did not abuse its discretion in refusing to decipher which portions of the recanting [witness's] statements were true and which portions were not." See *Harvey,* 366 Ill. App. 3d at 923. The parties in this case discussed how much of the witnesses' prior statements would be allowed into evidence. The trial court then ruled as follows:

"THE COURT: I listened to the testimony of Mr. McKnight.

And the record speaks for itself as far as the way he answered questions. I know that I had to admonish Mr. McKnight a number of times only to answer the question that was asked. I think at least four or five times.

At a minimum I had to direct him in that regard. I found that when he was answering questions he would attempt to give his own answer rather than the question that was asked. And his answers were not direct. In many cases they were evasive. And I understand that there were portions that in which his answers were consistent with the State's questions. But in the majority of his testimony, he was equivocating, and he was evasive. So as a matter of discretion which the Court has, I can either direct the State just to go to the impeachment, to the impeaching portions that affirmatively damaged the State or I could allow for context.

So that the jury has a complete understanding of the testimony to allow the handwritten and the grand jury.

And in considering this I believe and I would normally admit just a minimum which would be the direct impeaching statements.

However, in this particular case, with Mr. McKnight, it's hard to determine. And I believe in order to insure that the jury understands the testimony and the impeachment, I think that it's appropriate that the handwritten and the grand jury be read to the jury.

So I'm going to allow that over the defense objection."

Graham requested and was allowed a continuing objection to that testimony.

¶ 66    The trial court did state that it could allow additional statements into evidence to "allow for context. So that the jury has a complete understanding of the testimony to allow the handwritten and the grand jury." Graham argues the "completeness doctrine has no relevance here," and the State agrees.[3] However, the basis of the trial court's ruling was not the completeness doctrine, but the concern that the "direct impeaching statements" in McKnight's out-of-court statements were "hard to determine." McKnight's evasive testimony and claimed lack of memory rendered the inconsistencies between his trial testimony and prior statements significant. We cannot say no reasonable judge would reach the same decision as the trial court; therefore, we hold that the trial court did not abuse its discretion in admitting his prior statements in their entirety. *People v. Govea*, 299 Ill. App. 3d 76, 87 (1998); *People v. Steele*, 265 Ill. App. 3d 584, 596 (1994) ("The significant inconsistencies persuade us that the trial court did not err when it admitted Hall's previous statements into evidence even though some of his previous statements were also consistent with his testimony at trial.").

¶ 67                4. Improper Comments During Closing Argument

---

[3]    "Under the common law completeness doctrine, the remainder of a writing, recording or oral statement is admissible to prevent the jury from being mislead, to place the admitted evidence in context to convey its true meaning or to shed light on the meaning of the admitted evidence." *People v. Kraybill*, 2014 IL App (1st) 120232, ¶ 67. See also Ill. R. Evid. 106 (eff. Jan. 1, 2011).

¶ 68    Graham also argues he was denied a fair trial when the State made several improper comments in its rebuttal argument. Graham specifically argues (1) the State suggested McKnight was the victim of witness intimidation where there was no evidence of intimidation at trial; (2) the State falsely informed the jury that witnesses will tell the truth when they are in the safety of a police station or before the grand jury; and (3) the State impermissibly aligned jurors as middle class citizens against defendant, and mischaracterized his defense by claiming that Graham was claiming innocence and alleging a police conspiracy against him. Finally, Graham argues the State shifted the burden of proof to defendant to prove his innocence and by suggesting its burden is lessened in cases involving gangs. Graham asks this court to apply a *de novo* standard of review to this argument, despite "cases to the contrary," since "the propriety of a given comment is purely a legal question." We decline Graham's request. "Prosecutors are afforded wide latitude in closing argument. [Citation.] *** Prosecutorial misconduct warrants reversal only if it caused substantial prejudice to the defendant, taking into account the content and context of the comments, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial. [Citation.]" *People v. Averett*, 381 Ill. App. 3d 1001, 1007 (2010). See also *People v. Green*, 2017 IL App (1st) 152513, ¶ 80. "Whereas a reviewing court applies an abuse of discretion analysis to determinations about the propriety of a prosecutor's remarks during argument [citations], a court reviews *de novo* the legal issue of whether a prosecutor's misconduct, like improper remarks during argument, was so egregious that it warrants a new trial [citation]." *People v. Cook*, 2018 IL App (1st) 142134, ¶ 64.

¶ 69    In support of his argument, Graham cites *People v. Mullen*, 141 Ill. 2d 394, 406-07 (1990), for the proposition that "[p]rosecutorial comments which suggest that witnesses were afraid to testify because defendant had threatened or intimidated them, when not based upon any

- 41 -

evidence in the record *** are highly prejudicial and inflammatory. [Citation.]" (Internal quotation marks omitted.) *Mullen*, 141 Ill. 2d at 405. The statements Graham complains of were as follows:

"MR. LEAFBLAD [ASSISTANT STATE'S ATTORNEY]: So what do we have here with these witnesses? We have guys that have come from the same neighborhood where these shots have gone. These guys aren't dressed up, they aren't anything more than they are. And, ladies and gentlemen, you heard in this case from Archie McKnight's transcript how he was afraid that Donate Graham and Andrew Davis would come back to shoot him. Does your common sense tell you that that's that large of a leap, that people that are willing to shoot up a park on a nice day in April would somehow give him a reason to be afraid? Use your common sense. Now, when he testified in court, when all the things that happened in those transcripts and what he said in court, when he first told the truth, the defendant wasn't there. Andrew Davis wasn't there. Who knows who was in the courtroom when they were testifying, ladies and gentlemen."

Graham's attorney objected on the grounds the argument assumes facts not in evidence. The trial court overruled the objection stating, "It's argument." When the ASA resumed he did not continue to discuss any fear borne by the witnesses.

¶ 70 The State responds it did not suggest defendants intimidated McKnight. Instead, the State argues its rebuttal argument "suggests a general fear of defendant, as well as the fear of testifying against defendant in court." The State asserts it was reasonable for the prosecutor to argue McKnight might be fearful when faced with the person he had previously seen shoot the victims and its argument was supported by the evidence, particularly where McKnight testified

he initially did not talk to police because he feared defendants. Finally, the State argues the comments about McKnight's fear were invited by defense counsel's argument that McKnight did not show any signs of fear when testifying but instead looked "like a defiant 22 year old who didn't want to be here and was just going to say whatever it took to get him out the door."

¶ 71    The prosecutor's arguments concerning McKnight's professed fear were based on the evidence and reasonable inferences therefrom. The ASA's statements did not explicitly suggest McKnight changed his story on the witness stand because defendants threatened him. See *Green*, 2017 IL App (1st) 152513, ¶ 89. Graham's argument focuses on the particular statement by the ASA that: "when he first told the truth, the defendant wasn't there. Andrew Davis wasn't there. Who knows who was in the courtroom when they were testifying, ladies and gentlemen." This statement by the ASA could be read to imply at most that McKnight changed his story on the witness stand because someone other than defendants may have seen him and retaliated against him. Because the State did not say Graham threatened or intimidated McKnight into changing his story, Graham's argument that a "related comment," that defendants did not "like" the eyewitnesses, "set the table for the later claim that Graham *** wished the witnesses harm" must also fail.

¶ 72    In *Green*, this court found that "[t]he State, drawing reasonable inferences from the evidence, hypothesized why Broomfield might have recanted, arguing that 'maybe' he did so because (1) he did not want others to view him as a 'snitch,' (2) he did not want to testify in court, or (3) he was afraid of something." *Id.* ¶ 86. A similar interpretation of the State's argument in this case is buttressed by the ASA's comments after defense counsel objected. The ASA continued:

"MR. LEAFBLAD [ASSISTANT STATE'S ATTORNEY]: Your common sense also tells you and your life experience these guys are under pressures that none of us in this courtroom can understand. None of us. So is it a far stretch to say that back in 2009 when they were speaking to the police officers they were telling the truth?

* * *

You will get that instruction. The judge is going to read it to you in a few minutes. And this instruction wasn't written yesterday. It wasn't written for this case. This is part of the law in the State of Illinois and what this instruction tells you is that people like Archie McKnight and Ronald Brown will do what they did; that when they were in the safety of a police station or grand jury they'll tell the truth but when it comes down to coming to court, taking the oath, pointing at the defendant, it's not easy to say he's a murderer. It's not. And then go back to your life and expect your life to be back to being normal now that you're a snitch. It is not easy. And none of us should understand or can understand the pressure."

In this case, as in *Green*, the State did not make a specific reference to threats or intimidation by defendants. The State's comments about McKnight's fears were based on the evidence, therefore *Mullen* is inapposite. We find "the State in the instant case never argued that defendant threatened or intimidated [McKnight] into recanting his prior statement. As a result, the State's comments were not prejudicial." *Id.* ¶ 90.

¶ 73    Next, Graham argues the above statement that "people like Archie McKnight and Ronald Brown *** when they [are] in the safety of a police station or grand jury [will] tell the truth" is

- 44 -

false, and "amplifies the prejudice form the State's false witness-intimidation claim."[4] We find

the State did not argue defendants intimidated McKnight into changing his testimony, and there

was no prejudice from the statements to which Graham refers. Although not cited by the parties,

the ASA making the rebuttal argument referenced an instruction that his partner told the jury

about. During the State's primary closing argument, the following arguments were made:

> "MR. MARTIN [ASSISTANT STATE'S ATTORNEY]: Then you've got
>
> testimony of Ron Brown and Archie McKnight. Now, the law understands that
>
> despite what they testified to each of them identified them multiple times as the
>
> killer of Mark Cooper and the shooter of Rakyah Whittier and the law recognizes
>
> that sometimes it's not easy coming in here, in court, and looking at Donate and
>
> saying you're a killer. That's not easy. It's not easy looking at Andrew Davis
>
> and saying you're a killer. So it allows you to consider all those prior statements.
>
> And there's a couple scenarios. First, the believability of a witness may be
>
> challenged by evidence that on some former occasion he made a statement which
>
> was not consistent with his testimony in the case."

"The reviewing court must consider the closing argument in its entirety, and the alleged

improper remarks must be considered in their proper context. [Citation.]" *Id.* ¶ 77. Viewing the

challenged comments in their proper context, it is clear the ASA did not misstate the law. When

viewed in context, the ASA's argument cannot be reasonably construed as an assertion of a free-

standing law that statements to law enforcement are more reliable than in-court testimony. The

---

[4] Graham did not object to this statement by the ASA, but argues all of the unpreserved errors in the rebuttal argument amount to plain error. Since "[t]he first step of plain-error review is determining whether any error occurred" (*People v. Thompson*, 238 Ill. 2d 598, 613 (2010)), we will review the substance of Graham's claims and perform a plain error analysis should any errors be identified.

ASA was referencing back to his co-counsel's argument properly stating the law concerning prior inconsistent statements (see Illinois Pattern Jury Instructions, Criminal. No. 3.11 (4th ed. 2000)) and applying that law to the facts of this case. In the context of the earlier argument, which the ASA on rebuttal directly invoked, the challenged argument reflected only the State's position that the witnesses' earlier statements made "in the safety of a police station or grand jury" were true, and their trial testimony was false. "It is well established that the State may discuss the witnesses and their credibility during closing argument, and that it may assume the truth of the State's evidence." *Id.* The State's argument was not improper.

¶ 74    Next, Graham argues the State "improperly aligned jurors as middle class citizens against the criminal, presumably poor, defendant." Graham asserts this created an improper "us-versus-them" theme. In *People v. Wheeler*, 226 Ill. 2d 92, 129 (2007), our supreme court held "it is improper for a prosecutor to utilize closing argument to forge an 'us-versus-them' mentality that is inconsistent with the criminal trial principle that a jury fulfills a nonpartisan role, under the presumption that a defendant is innocent until proven guilty. [Citation.]" *Wheeler*, 226 Ill. 2d at 129 (citing *People v. Johnson*, 208 Ill. 2d 53, 80 (2003)). In *Wheeler*, the court found the chief goal of the prosecutor's argument was to unite the interests of the jurors in their own safety with the interests of the State in convicting the defendant. *Id.* at 130-31. The improper comments did not consist of "a few solitary improper remarks." *Id.* at 131. The State's argument in *Wheeler* "urged the jurors to consider their own safety in deliberation rather than deliberating only on the actual guilt or innocence of defendant." *Id.*

¶ 75    In this case, the comments about which Graham complains were as follows:

"MR. LEAFBLAD: Now, the other thing we agree with is when they said

that this crime doesn't make sense, as we sit here in the comfort of this courtroom

a long way away from that April day in 2009 it shouldn't make sense to you. Ladies and gentlemen, you're from the community. People that go to work in the morning, people that have jobs and responsibilities and families and homes. This shouldn't make any sense. Your middle class values should not be able to understand what is important in a criminal's world. This is his criminal world that we brought you into."

¶ 76    We find the prosecutor was simply commenting on the senseless nature of the crime at issue, which is not improper. See *People v. Rodriguez*, 134 Ill. App. 3d 582, 596 (1985) ("Defendant also argues that the prosecutor dwelt on the seriousness of the crime when he said, 'this case, ladies and gentlemen, is the worse [*sic*] crime I have ever seen as a prosecutor.' We note that the quoted remark followed a similar comment by defense counsel, to wit: 'What happened to those two kids is the most brutal, disgusting, senseless, ugly crime that was ever committed ***.' We do not condone the prosecutor injecting his personal assessment or professional judgment of the severity of a crime into the trial, but we think it is unrealistic to hold the prosecutor to a standard of sterile analysis in response to defense counsel's touching show of humanity."). In this case the ASA, unlike the ASA in *Wheeler*, did not utilize closing argument to move the jury away from its responsibility to determine defendant's guilt or innocence based on the evidence and the law with the application of reason and deliberation, and instead to decide the case from an expression of misdirected emotion or outrage. *Id.* at 128 (quoting *Johnson*, 208 Ill. 2d at 87-88). Moreover, the comment "[y]our middle class values should not be able to understand what is important in a criminal's world" was isolated and fleeting. In context, where the prosecutor was describing the crime based on the evidence adduced at trial, the comment was not improper. See *People v. James*, 2017 IL App (1st)

143391, ¶ 106 ("But this was a single, fleeting remark, made in a context in which (as we have noted) the mere reminder that a mother had to endure this senseless violence while holding a nine-month-old baby surely would have stirred the jurors' emotions, anyway. We cannot say that this alone was misconduct."); *People v. Gonzalez*, 388 Ill. App. 3d 566, 591 (2008) ("the brief reference to defense counsel engaging in 'an old trick' was not a central theme in the State's closing argument and therefore did not shift the jury's focus away from the facts of the case or otherwise deny defendant a fair trial").

¶ 77     Next, Graham claims the State improperly invented a defense theory of a conspiracy between the Gangster Disciples and the Chicago Police Department to convict him, when defense counsel "expressly disclaimed any conspiracy involving State actors." Graham relies on *People v. Hopkins*, 363 Ill. App. 3d 917 (2005), in which the defendant argued the prosecutor "engaged in misconduct when he told the jury in his rebuttal closing argument that the defense's position was that [two witnesses] engaged in a 'conspiracy' with the police to frame [the] defendant." *Hopkins*, 363 Ill. App. 3d at 987. This court held "[w]e do not see how defense counsel's closing remarks about the credibility of the State's witnesses permitted the prosecutor to reframe defendant's arguments as claims of a conspiracy among the State's witnesses." *Id.*

¶ 78     In this case, the State responds defense counsel introduced the idea of a conspiracy, including police involvement, and defendant cannot complain about the State's comments rebutting that claim. The State points to the following statement by defense counsel, after which counsel proceeded to discuss the police officers' testimony. Counsel stated: "The government's remaining witnesses that are trying somehow to tie Donate to this vicious, cowardly act can be explained by anybody else or can be explained that anybody else could have committed this offense." In isolation, it is difficult to discern what defense counsel is arguing in the quoted

passage, but read in context of the remainder of his closing argument, what defense counsel was arguing was that the State's evidence could point to anyone (including defense counsel—a statement that drew an objection from the State that was overruled). It is not reasonable to construe defense counsel's argument as implying police involvement in a conspiracy to convict Graham. Nonetheless, the State points to other comments by defense counsel that do imply a conspiracy between the State's witnesses. Defense counsel argued as follows:

"MR. STACH [DEFENDANT GRAHAM'S ATTORNEY]: No one here believes that the Chicago Police, the government, the Cook County State's Attorney's office [*sic*], the Illinois State Police intentionally randomly picked out Donate and said let's put this murder on him. The same cannot be true for Breed, [McKnight, Brown], and [Stribling], because we believe that's exactly what happened."

¶ 79    In the portions of the State's rebuttal relevant to this issue, the State argued as follows:

"MR. LEAFBLAD: Who is the defendant? Let's just back this up for a minute. ***[I]n the grand scheme of things who is he? Why are the Gangster Disciples and the Chicago Police Department going to work together to put a case on him and Andrew Davis? Why? All right. It doesn't make any sense. *** Now, what are the other things that are true, that would have to be true for this also to be true? The Gangster Disciples, because according to the defendant's argument they're the ones that kicked this all off, so we've got dead Mark Cooper, [shot] in the butt Rakyah, all right? No leads. Okay. So now the Gangster Disciples have a problem. *** What problem do they have? Enough that they're going to have to pick out Andrew Davis and Donate Graham as

- 49 -

murderers?  What problem is going to prompt them to start framing somebody, 'cause this is really what they're saying here, is they're framing somebody.  *** [I]f there is a problem that is so severe that they're going to frame somebody for it, who are their witnesses going to be?  *** Are you really trying to say the Gangster Disciples, you know, are going to put their futures on Archer [*sic*] McKnight, on Ronald Brown?  Come on.  It's ridiculous.  ***

* * *

Here's where it also falls apart.  The police department.  ***

* * *

Now, so the Chicago Police Department, they're going to have to stop any investigation that they're conducting right now.  So oh, wow, let's go the Donate Graham and Andrew Davis route.  They have to stop.  The true killers are out there.  [Gangster Disciples] still have their problem and they have to make the evidence fit.  They have to make the evidence fit these guys.  And if this is truly what we have there it's either a criminal action we have on behalf of our detectives *** it's foolish and lazy.  It's either/or.  You can't be a competent detective and let this happen.  So you have to assume that's true now.  So what do have [*sic*]?  If these guys were as devious as the defendant wants you to believe or as lazy as they want you to believe how much harder would it be to get Rakyah to make an identification of one or two of them?  *** One other thing if we're down this route so far, we have an off-duty Chicago Police officer.  If we're really trying to tag Donate Graham with all the stuff that the defense wants you to believe the Gangster Disciples and Chicago Police Department did, Officer

- 50 -

> Sellers would say you know what, I saw those guys in the car and they were
>
> waving at me. It didn't happen."

¶ 80    We find no error in the prosecutor's rebuttal. The ASA was merely responding to defendant's argument that the witnesses conspired to frame defendants. The majority of the rebuttal took defense counsel's argument to its logical, albeit extreme, conclusion to attempt to persuade the jury of the unlikelihood defendant's argument was true. That conclusion would require the complicity or apathy of the Chicago Police Department. Some of the ASA's statements, in isolation, could be read to veer into the territory of an actual police conspiracy that defense counsel did not raise and expressly disavowed. Read in its entire context, however, we find the State did not "reframe defendant's arguments as claims of a conspiracy" between the Gangster Disciples and the Chicago Police Department. Compare, *Hopkins*, 363 Ill. App. 3d at 977. The ASA's rebuttal argument could be described at most as a hyperbolic, but provoked, response to defense counsel's argument. The argument did not deny Graham a fair trial. *People v. Ramos*, 396 Ill. App. 3d 869, 877 (2009) (citing *People v. Evans*, 209 Ill. 2d 194, 225 (2004) (prosecutor's provoked response in rebuttal cannot be basis for claim of a denial of a fair trial)). Moreover, we find that even if the State's arguments were improper, defendants were not prejudiced and the verdict would not have changed absent the statements. See *Hopkins*, 363 Ill. App. 3d at 977-78. Graham's only argument concerning prejudice is that the statement was "particularly harmful because it played on jurors' positive feelings about law enforcement, which is improper." In support of this argument, Graham cites *People v. Blue*, 189 Ill. 2d 99, 132 (2000). Unlike in *Blue*, however, in this case the State's remarks were not "a transparent play to the jury's sympathy and loyalty to law enforcement." *Blue*, 189 Ill. 2d at 132. Additionally, unlike in *Blue*, the remarks in this case were related to the fact of Graham's guilt or innocence

because defense counsel attempted to discredit the State's witnesses against Graham, and the State was attempting to show that attempt was absurd.

¶ 81    Next, Graham argues the State erected a claim of innocence as a "straw man," and the State's "invocation of Graham's supposed innocence also distorted the State's burden of proof." The State argued:

> "MR. LEAFBLAD: That's why the whole thing makes no sense, ladies and gentlemen, because the defendant is arguing that not only is he not guilty but he's innocent.  So let that ring through your ears for a minute.  It's not because we didn't prove all the elements, but he's saying he's innocent, he's wrongfully accused.  Think about all the things that would have to be true for that to be true."

¶ 82    We find *Ramos* instructive.  In *Ramos*, the defendant argued the prosecutor's argument suggested to the jury that in order to acquit him, the jury must conclude that the State's witnesses had lied and conspired against him, and that defendant had the burden to "prove the frame up." (Internal quotation marks omitted.)  *Id.* at 876-77.  The *Ramos* court held:

> "Defendant's interpretation of the prosecutor's comment about the manufacturing of evidence was likewise lacking its proper context.  There, the prosecutor was directing the jury to the evidence corroborating the State's theory of the case and encouraging the jurors to use their common sense in evaluating the testimony and the evidence.  [Citation.]
>
> We discern nothing from the State's argument that served to shift the burden to defendant to establish a conspiracy against him or show that witnesses lied.  Instead, the prosecutor succinctly demonstrated why and how the State proved its case based on physical and testimonial evidence.  ***  The argument

never approached the position that defendant had to prove the State's witnesses were lying or had fabricated evidence in order for defendant to be acquitted. Consequently, we find no impropriety in any aspect of the State's initial and rebuttal closing arguments." *Id.* at 877.

In this case, before making the complained of argument, the ASA was discussing the physical evidence the State believed corroborated the witnesses' testimony. After the complained of statement, when the prosecutor said "[t]hink about all the things that would have to be true for that to be true." the prosecutor immediately began a meticulous deconstruction of defense counsel's conspiracy theory. As in *Ramos*, we "discern nothing from the State's argument that served to shift the burden to defendant" to prove "all the things that would have to be true" for defendant to be innocent. Instead, "the prosecutor was directing the jury to the evidence corroborating the State's theory of the case" and demonstrating "why and how the State proved its case based on physical and testimonial evidence." See *id.* Consequently, we find no error in this portion of the State's argument. *Id.*

¶ 83    Finally, Graham argues the State invoked gang evidence to lessen its burden of proof. Specifically, Graham argues the following statement by the prosecutor seems to suggest the burden (not quantified) is lessened in cases involving gangs:

"MR. LEAFBLAD: Let's make one thing perfectly clear, ladies and gentlemen. He is not George Washington, he's not Thomas Jefferson, he's not Alexander Hamilton, he's not a revolutionary. He is the defendant in a murder case. A murder case where the gang involvement for shooting on the south side of Chicago. And you can talk about the burden of proof all you want, but, ladies and gentlemen, it is the law of the land in criminal cases. It's not a scary monster

that walks through alleys and shoots people. It is the constitutional burden of proof in criminal cases. Yes, our founding fathers put that in the documents, you know, in our rights, in the constitution. That is our rights. All right. Burden of proof is in every criminal case and we have met it in this case."

Later, after discussing how the crime "shouldn't make sense" to the jurors (which, as explained above, was not improper), the prosecutor continued:

"MR. LEAFBLAD: You know from the testimony how that truck drove by once and twice. They were finding out who was out there. Who would be in their kill zone as they lit that park up. They knew. It shouldn't make sense. This is inherently irrational behavior. Who on earth would level a gun at another human being and fire shot after shot at him? For nothing. For Gangster Disciples, for Four Corner Hustlers, for Black P Stones. Shot them. For nothing. This can't make sense here but we're not here and that's not our burden of proof, to talk about what makes sense and what doesn't make sense. We're talking about the evidence that showed him and showed you, ladies and gentlemen, that he is part of the kill team that ended Mark Cooper's life and put a bullet in the rear end of Rakyah."

¶ 84     It is not reasonable to conclude that the prosecutor was arguing that the State has a diminished burden of proof in gang-related cases. The prosecutor's statement that "that's not our burden of proof" was directed at the thought there could be a logical reason for someone to "level a gun at another human being and fire shot after shot at him" because of the victim's gang affiliation. The prosecutor's comments in no way diminished the State's burden of proof.

¶ 85                              5. Admissibility of Gang Evidence

¶ 86     Davis also argues improprieties with regard to gang evidence.  Davis argues the trial court erred in allowing the State to introduce prejudicial gang evidence because there was no evidence he was motivated to act on behalf of a gang and no witness testified to firsthand knowledge he was in a gang, the gang evidence had no bearing on the charged offenses, and the State failed to establish the offense was gang-related.

> "Evidence a defendant is a gang member or is involved in gang activity is admissible only where there is sufficient proof 'membership or activity in the gang is related to the crime charged.' [Citation.] 'To ensure a careful exercise of discretion, a trial court should require the prosecution to demonstrate a clear connection between the crimes and the gang-related testimony.' [Citation.] Where the State's theory of gang-related motive is not supported by the evidence, the only purpose for telling the jury that the crime was gang related could be to inflame the passion or arouse prejudice against gangs. [Citation.]" *People v. Roman*, 2013 IL App (1st) 110882, ¶ 25.

"The erroneous admission at trial of *** gang evidence does not automatically warrant reversal. [Citation.] This error is harmless where the court is satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction. [Citation.] The effect of inflammatory evidence depends upon the circumstances of the case. [Citation.]" (Internal quotation marks omitted.) *Id.* ¶ 36. "It is the function of the trial court to weigh the probative value of the evidence against the risk of unfair prejudice it carries; we will not overturn a court's decision on that balancing process absent a clear abuse of that discretion." *Id.* ¶ 23.

¶ 87     The State responds the trial court balanced the probative value of the gang evidence against its prejudicial effect and properly admitted the evidence to show motive, intent, and

identification. Specifically, the State argues gang evidence was admissible to provide a motive and context for a crime that would otherwise have been inexplicable. According to the State, the evidence "established that the shooting was the result of an ongoing territory dispute between the Gangster Disciples and the Four Corner Hustlers. The State argues *Roman* is distinguishable because in this case, the State "established a connection between the crime and the gang-related activity." Alternatively, the State argues that if it was error to admit gang evidence, the error was harmless because the outcome of the trial could not have been different without the gang evidence where the remainder of the evidence against Davis was overwhelming.

¶ 88    In ruling on the motion *in limine* regarding gang evidence, the trial court stated, in part, as follows:

> "THE COURT: [A]s a preliminary matter as far as the case is concerned, I believe that it is relevant and appropriate as to the issue of motive and intent ***. And considering the probative value versus the undue prejudice, I don't believe that the undue prejudice substantially outweighs the probative value of the evidence. And that is that the jury has some context to consider the facts in the case so that they have some ideas as to the motive and whether or not there was intent on the part of the defendants to commit this particular crime. So, therefore, it would be admitted for that purpose only."

The trial court admonished defense counsel that it could object during trial if it felt the State was exceeding the trial court's order admitting gang evidence on the limited issues of motive and intent. On appeal, Davis points to no such objections. Contrary to Davis' assertion, there was evidence he was in a gang although it was a different gang than the two gangs the evidence revealed were in a "war." Regardless, Davis' co-defendant was in the gang that was identified as

having a conflict with a rival gang in the neighborhood where the shooting occurred. There was also evidence that a member of that rival gang was the intended victim of the shooters, and the people in the park were members of that same rival gang. In light of the evidence adduced at trial, we find this case contains sufficient proof gang activity is related to the crime charged. *Roman*, 2013 IL App (1st) 110882, ¶ 25.

¶ 89    Defendant relies on *People v. Iniguez*, 361 Ill. App. 3d 807 (2005), which is distinguishable. In that case, the court found "the State inundated the jury with evidence about street gangs." *Iniguez*, 361 Ill. App. 3d at 816. The evidence included two witnesses who both gave lengthy testimony about street gangs. *Id.* In this case, the State did not call an expert to testify about the structure, territories, and alliances of the gangs at issue. Compare, *id.* at 816-17. In *Iniguez*, the court found the admission of the gang evidence was reversible error because "[a]lthough this extensive amount of gang evidence was allowed, there was no evidence the defendant was aware of the so-called motivating fact—a street gang fight six months before the killing" (*id.* at 817) and the probative value of the evidence "was virtually nil" (*id.*). In this case, the jury was not inundated with gang evidence, and the evidence was probative of defendants' motive to fire into the park and that they did so intentionally to shoot a member of a rival gang. Similarly distinguishable is *People v. Mason*, 274 Ill. App. 3d 715 (1995), also cited by defendant. The basis of the court's holding that gang evidence was improperly admitted in that case was that the gang evidence that was admitted was irrelevant. See *Mason*, 274 Ill. App. 3d at 722. The *Mason* court concluded that "[w]hile the organizational structure of the Gangster Disciples was relevant to the State's case in order to demonstrate defendant's possible motive for shooting Hayes, facts about gang rivalries, presentment, graffiti, tattoos, and drug sales clearly do not go to defendant's motive." *Id. Mason* reflects the long standing rule that relevant gang

evidence of motive, as in this case, is admissible. See *Roman*, 2013 IL App (1st) 110882, ¶ 24.

Finally, *People v. Joya*, 319 Ill. App. 3d 370 (2001) is also distinguishable. In that case, "the only evidence that there was any connection between [the] defendant's gang membership and the shooting of [the victim] was *** testimony that, two or three months prior to the shooting, [the] defendant told [a witness] that he [(the defendant)] was a member of [a] street gang." *Joya*, 319 Ill. App. 3d at 377. The evidence in *Joya* was that the incident "was a bar fight and there was absolutely no testimony that anyone mentioned gang involvement in the shooting either prior to or after the shooting." *Id.* In this case, on the contrary, after the shooting several witnesses stated the shooting was related to a gang war in the neighborhood. Because the gang evidence in this case was admitted for the limited purpose of showing motive and intent, we cannot say no reasonable court would adopt the trial court's judgment that the probative value of the gang evidence outweighed its prejudicial effect. Accordingly, the trial court did not abuse its discretion in admitting gang evidence in this case.

¶ 90                                          6. *De Facto* Life Sentence

¶ 91     Davis asserts he was 17 years old at the time of the offense, the trial court did not consider the special circumstances of youth that often make lengthy sentences particularly inappropriate for youthful offenders, and he will not be eligible for parole until he is 93 years old. Thus, Davis argues, his sentence amounts to an unconstitutional *de facto* life sentence, his sentence should be vacated, and the case should be remanded for resentencing under the current law making application of mandatory firearm enhancements discretionary for defendants who were under 18 years old at the time of the offense.

> "In *Miller*, the Supreme Court held that the eighth amendment to the
> United States Constitution forbids a sentencing scheme that mandates life in

prison without possibility of parole for juvenile offenders. [Citation.] *** The Supreme Court emphasized that a mandatory sentencing scheme for juveniles prevents the trial court from considering numerous mitigating factors, such as the juvenile offender's age and attendant characteristics; the juvenile's family and home environment and the circumstances of the offense, including the extent of the juvenile's participation and the effect of any familial or peer pressure; the juvenile's possible inability to interact with police officers or prosecutors or incapacity to assist his or her own attorneys; and the possibility of rehabilitation even when the circumstances most suggest it. [Citation.]

* * *

A mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison. *Miller* makes clear that a juvenile may not be sentenced to a mandatory, unsurvivable prison term without first considering in mitigation his youth, immaturity, and potential for rehabilitation." *People v. Reyes*, 2016 IL 119271, ¶¶ 3, 9.

Where a juvenile is sentenced to an unsurvivable prison term without considering the appropriate factors related to his or her youth, the sentence must be vacated as unconstitutional pursuant to *Miller*. *Id.* ¶ 10. Moreover, where "a defendant's sentence is vacated on appeal and the matter remanded for resentencing, under section 4 of the Statute on Statutes, the defendant may elect to be sentenced under the law in effect at the time of the new sentencing hearing." *People v. Hunter*, 2017 IL 121306, ¶ 54 (citing *Reyes*, 2016 IL 119271, ¶ 12). See 730 ILCS 5/5-4.5-105

(West 2016) ("Sentencing of Individuals Under the Age of 18 at the Time of the Commission of an Offense").

¶ 92　In this case, the State argues Davis did not receive a "mandatory" *de facto* life sentence as prohibited by *Reyes*. See *Reyes*, 2016 IL 119271, ¶ 9 ("*Miller* makes clear that a juvenile may not be sentenced to a *mandatory*, unsurvivable prison term without first considering in mitigation his youth, immaturity, and potential for rehabilitation." (Emphasis added.)). (The State concedes Davis' sentence is unsurvivable.) However, our supreme court recognized that "[t]he greater weight of authority has concluded that *Miller* and *Montgomery* send an unequivocal message: Life sentences, whether mandatory or discretionary, for juvenile defendants are disproportionate and violate the eighth amendment, unless the trial court considers youth and its attendant characteristics." *People v. Holman*, 2017 IL 120655, ¶ 40. Our supreme court expressly held that "*Miller* applies to discretionary sentences of life without parole for juvenile defendants." *Id.*

¶ 93　The State further argues Davis' discretionary *de facto* life sentence does not violate the eighth amendment because here the trial court gave adequate consideration to youth-related sentencing factors before imposing sentence, as required by *Holman*. In *Holman*, our supreme court had to determine "what it means to apply *Miller*." *Id.* ¶ 40. The court noted that "[s]ome courts have read *Miller* narrowly, holding that trial courts must consider generally mitigating circumstances related to a juvenile defendant's youth." *Id.* ¶ 42. "Other courts have read *Miller* more broadly, holding that trial courts must consider specifically the characteristics mentioned by the Supreme Court." *Id.* ¶ 43. Our supreme court adopted "the latter approach." *Id.* ¶ 44. Thus, the court held:

"Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation. [Citation.]" *Id.* ¶ 46.

In *Holman*, "the trial court had no evidence to consider on any of the statutory factors in mitigation, but some evidence related to the *Miller* factors" (*id.* ¶ 50) from "the trial evidence and the PSI, as well as the evidence and arguments from the sentencing hearing" (*id.* ¶ 48). The court specifically noted evidence before the trial court pertaining to the defendant's (1) chronological age and "mentality," (2) family, (3) degree of participation in the crime, (4) low intelligence, although "there was nothing presented at trial or sentencing to indicate that the defendant was incompetent," and (5) prospects for rehabilitation. *Id.* ¶ 48. The *Holman* court found that the trial court "concluded that the defendant's conduct placed him beyond rehabilitation and sentenced him to life without parole." *Id.* ¶ 50. Thus, "[t]he defendant's

sentenced passes constitutional muster under *Miller*." Here, the State argues that "[a]lthough perhaps not as clearly shown as in *Holman*, the record here indicates that the trial court considered *most* of the appropriate factors, making defendant's 80-year sentence constitutional." (Emphasis added.)

¶ 94      Davis' presentence investigation report states, in pertinent part, that Davis' older stepsister was shot and killed in May 2014. Davis maintains a close relationship with his siblings; he has no current information about his father and has had no contact with his father since 2008. Davis has a normal and respectful relationship with his mother. Davis reported a normal childhood, denied he ever suffered from any type of abuse during his childhood, he was not neglected, and was never involved with the Illinois Department of Children and Family Services. Davis only finished his freshman year of high school but reported he got "OK" grades. Davis denied having any special education needs in school for behavioral or learning disorders and reported he got along well with other students and teachers. The PSI states Davis was not currently suffering from any health problems or taking any medication. Davis reported he has never been treated by a mental health professional, never taken any psychotropic medication, has not attempted suicide, and did not feel the need to speak to a mental health professional. Davis reported he was 17 when he first began to abuse marijuana but he has not used any other drugs. Davis has never been evaluated or treated for drug abuse and did not feel the need for treatment. Davis reported no problems with his interpersonal relationships, no problems eating, sleeping, or concentrating, and did not feel any anxiety or stress at the time. Davis did not feel hostile or aggressive toward anyone or anything at the time. The PSI states Davis was cooperative and forthcoming during his interview. The PSI states Davis has pro-social relationships with his

non-criminal family and friends. He has a positive attitude towards the criminal justice system. He feels good about people who get an education, are employed, and obey the law.

¶ 95    At Davis' sentencing hearing, the State began its argument in aggravation by entering four victim impact statements into evidence and publishing one—that of the mother of the deceased. The parties stipulated to the factual basis for a murder charge against Davis from a shooting that predated this case. A witness, if called, would testify that she and Davis were walking down the street, Davis saw a group of individuals in front of a house, he decided he should shoot at them, and Davis fired a handgun at the group of people sitting in front of a residence and struck a man in the chest, killing him. The parties further stipulated to two charges against Davis for incidents occurring while in jail on this case. Davis was charged with aggravated battery of a correctional officer, a Class 2 felony, and possession of a "shank." In mitigation, Davis' attorney stated:

"MS. KUCABA: My client has no publishable background. He is in his early 20's. This is the first felony conviction of his life.

His mother has been here each and every time. She is very involved in his life. She loves him very much. He has been her support. She leans on him. She needs him to help her survive and we are asking because this is his first felony conviction that you give him the minimum of 45."

Davis declined the opportunity to address the court. In arguments, Davis' attorney stated as follows:

"MS. KUCABA: Your Honor, as you know, my client has no background. He is a young man. ***

- 63 -

As to him being a terrible inmate, he is not a terrible inmate. He had two other cases. These are not young men when they first get into Cook County they have trouble assimilating and behaving. He's been in custody a significant period of time.

This is his only background at this point. He's only been convicted of one case and we are asking on both the attempt and the murder you give him the minimum."

The trial court made the following relevant statements after the hearing when sentencing Davis:

"THE COURT: I did hear the evidence during the trial and I also have heard the post trial motions. I have reviewed the presentence investigations. *** I have heard matters, additional matters in aggravation and mitigation. I have heard the opportunities that both defendants have had for the right of elocution and I have heard arguments for sentencing in this case.

It's unfortunate that a number of times in this court I have to say that these particular situations are senseless. In this particular case, we have, as someone argued, people, friends who grew up together and then for whatever reason had some disagreements and settled those disagreements with firearms. As a result, we have a person killed and another person wounded.

* * *

Now as far as Mr. Davis is concerned, in looking at the matters in aggravation and mitigation along with the presentence investigation, as far as the first degree murder count is concerned, counts one and two, I am going to impose a sentence of 40 years on the first degree murder with a 15-year enhancement for

total of 55 years. That's as to count one. Count two merges into count one for purposes of sentencing.

Again, as far as Mr. Davis is concerned, on counts 10 and 11, as I indicated previously with Mr. Graham, I believe they are mandatory consecutive sentences the first degree murder and attempt murder. On count 10, I will impose a sentence of 10 years on the attempt first degree murder plus 15-year enhancement for total of 25 years on that. Again, murder sentence is 100 per cent. The attempt first degree murder is 85 per cent.

I will add that as far as mandatory supervised release on the murder, and this is as to Mr. Graham and Mr. Davis, there is a three-year period of mandatory supervised release as far as the murder counts are concerned. There is also a three-year period of mandatory supervised release as far as the attempt first degree murder counts are concerned and that's as a Class X felony. So those are the sentences that the Court is imposing for both defendants."

¶ 96    In this case, "we find no error upon conducting a *Holman* analysis of [Davis']
sentencing." See *Johnson*, 2018 IL App (1st) 153266, ¶ 24. "A court revisiting a discretionary
sentence of life without parole must look at the cold record to determine if the trial court
considered such evidence at the defendant's original sentencing hearing." *Id.* ¶ 47. "[A] key
feature of the juvenile's sentencing hearing is that the defendant had the opportunity to present
evidence to show that his criminal conduct was the product of immaturity and not incorrigibility.
[Citations.]   [T]he *Holman* factors are a nonexhaustive list and *** nothing in *Miller* or *Holman*
suggests that we are free to substitute our judgment for that of the sentencing court because the
issue is not the particular sentence the trial court imposed but whether defendant had the

opportunity to present evidence regarding his youth and the court considered his youth and its attendant characteristics in reaching its sentencing decision. [Citation.]" (Internal quotation marks omitted.) *Id.* ¶ 24 (citing *People v. Croft*, 2018 IL App (1st) 150043, ¶¶ 23, 32-33 (quoting *Holman*, 2017 IL 120655, ¶ 49)).

¶ 97    Here, Davis had multiple opportunities to present evidence regarding his youth. He took advantage of one by cooperating in his interview for his presentence investigation report (PSI), but chose to forego another by refusing to speak at his sentencing hearing. Further, the trial court in this case considered Davis' youth and its attendant characteristics in reaching his sentencing decision. The trial court stated it considered the evidence at trial, the PSI, and the arguments in aggravation and mitigation. The trial court was aware of Davis' age. The PSI addressed facts related to Davis' immaturity, impetuosity, and failure to appreciate risks and consequences in the form of Davis' prior juvenile adjudications, adult charges, social history, and behavioral issues in school. The PSI specifically addressed Davis' family and home environment, and the trial court was well aware of Davis' degree of participation in the crime. The trial informed the court that familial pressures were not involved and also that "there was no evidence that [Davis] was pressured into the offense." *Johnson*, 2018 IL App (1st) 153266, ¶ 25. The court observed defendant during trial and thus was familiar with his ability to deal with police officers or prosecutors and his capacity to assist his attorneys, and could also glean insight on those topics from the PSI's report on Davis' psychological, emotional, and personal issues and well as his behavior while jailed for this offense. In this case, there was no evidence Davis "was unable to deal with police officers or prosecutors, nor incapable of assisting his own attorneys, which is the fourth *Holman* factor." *Id.* ¶ 25. All of this information also would inform the trial court about Davis' prospects for rehabilitation, and the trial court found that this

case was "senseless. In this particular case, we have, as someone argued, people, friends who grew up together and then for whatever reason had some disagreements and settled those disagreements with firearms." Compare, *id.* ("While the *Croft* trial court did not expressly find the defendant incorrigible, it found him to be 'really cold hearted, almost inhuman in his participation in his brutal, heinous, evil doing.' ").

¶ 98    "As in *Croft*, 'we have examined the cold record of the circuit court's [sentencing] hearing ***, which includes the common law record and report of proceedings, and find that the circuit court considered evidence of the defendant's youth and its attendant characteristics at the time of sentencing and that the defendant had' the opportunity required by *Holman*. [Citation.] As in *Croft*, the trial court had before it the trial evidence, the PSI, and the sentencing arguments of the parties. [Citation.]" *Johnson*, 2018 IL App (1st) 153266, ¶ 24. In this case the *Holman* factors were sufficiently addressed; we cannot say that Davis' sentencing hearing was constitutionally defective. *Id.* ¶ 26.

¶ 99                                                 CONCLUSION

¶ 100   For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 101   Affirmed.